HENDERSON *v.* CENTRAL PASSENGER RY. CO.[1]

CENTRAL PASSENGER RY. CO. *v.* LOUISVILLE CITY RY. CO.[1]

*(Circuit Court, D. Kentucky. July 22, 1884.)*

1. FRANCHISE — RAILROAD CORPORATION — CONSTRUCTION OF GRANT — MOTIVE POWER.

A legislative grant to the Louisville & Portland Railroad Company of a franchise to build and operate a railroad from Louisville to Portland, along such streets as the city council should consent to, with power to use passenger and burden cars, to furnish means of transportation, to charge tolls for passengers and freights, and "to do and perform every act and thing necessary and proper to carry into effect the provisions of that act and promote the design of the corporation," but without specifying what motive power should be used, authorized the city council to limit the power to be used to horse-power.

2. CORPORATION — SALE OF FRANCHISE — WHAT PASSES THEREBY — REPEAL OF FRANCHISE — CONSTITUTIONALITY.

The Kentucky act of February 14, 1856, provided that all privileges and franchises thereafter granted to corporations should be subject to amendment or repeal at the will of the legislature. The L. & P. R. Co. had theretofore been incorporated, and under its charter had built and operated a street railroad on Bank street. Thereafter, in 1866, the Citizens' P. Ry. Co. was incor-

1 Reported by Geo. Du Relle, Asst. U. S Atty.

porated, and by its charter empowered both to build and operate street railways, with the consent of the city council, and to lease or purchase the L. & P. Railroad, "its franchises and all property." It thereupon purchased the L. & P. Railroad, its franchises and property, and operated the road on Bank street. The corporate life of the L. & P. R. Co. was without limit; that of the Citizens' P. Ry. Co. was limited to 30 years. Thereafter, in 1872, the L. C. Ry. Co., which was incorporated in 1864, purchased from the Citizens' P. Ry. Co. all of its roads, property, and franchises. *Held,* that the corporate existence of the L. & P. R. Co., and its right as a corporation to operate the road, did not pass by the sale of the Citizens' P. Ry. Co., nor by the sale from the Citizens' P. Ry. Co. to the L. C. Ry. Co.; that the corporate life of the Citizens' P. Ry. Co. was not extended beyond 30 years by the purchase from the L. & P. R. Co : that the Citizens' P. Ry. Co. and the L. C. Ry. Co. each operated the road under its own charter; that each of said charters, having been granted subsequent to the act of 1856, was subject to the provisions of that act, and that their amendment or repeal was constitutional.

3. RIGHT OF WAY—DUE PROCESS OF LAW—ABANDONMENT BY NON-USER—PRESUMPTION OF ABANDONMENT—CONSTITUTIONALITY OF NEW GRANT

A right of way acquired by a railroad corporation, prior to the act of 1856, and transferred to a corporation created subsequently to said act, is property, and a legislative enactment giving it to another corporation is not due process of law. Such right of way may be lost by abandonment, and a non-user of more than 10 years is *held* to be sufficient evidence of abandonment. Abandonment is to be more readily presumed where the easement is granted for the public benefit than where it is held for private use. When such a right has been so abandoned, it is constitutional for the state to grant it to another corporation.

In Equity. On motions to dissolve injunctions.

*A. P. Humphrey* and *St. John Boyle,* for Louisville City Ry. Co. and Mrs. Henderson.

*Brown & Davie, Barnett, Noble & Barnett,* and *Zach. Phelps,* for Central Passenger Ry. Co.

BARR, J. These cases come to this court from the Louisville chancery court, and from the vice-chancellor's court, with injunctions already granted upon *ex parte* motions; and they are now submitted upon motion of defendants, in each case, to dissolve the injunctions. The Louisville City Railway Company has filed a cross-bill against the Central Passenger Railway Company, and has moved for an injunction. These motions really involve the same question, and will be considered together. The material question is, who has the right to run a street railway down Bank street, in this city, from Nineteenth street to and through Portland to the wharf, by what is commonly called the "Bank-street route?" The Central Passenger Railway Company claims this right by and under the authority of an ordinance approved January 25, 1884, and an act of the general assembly approved March 14, 1884. The act repeals all laws and ordinances in conflict with the grant therein made, which is a grant to build and operate a street railway over the route in controversy. This authority is sufficient, and gives the Central Passenger Railway Company this route, unless the act itself is unconstitutional, as impairing the obligation of a contract, or because it deprives the Louisville City Railway Company of its property without due process of law.

The state of Kentucky owned, by purchase, the Lexington & Ohio Railroad, and donated to the Kentucky Institution for the Education of the Blind that part of the road which ran from Sixth street, in Louisville, along Main street, and over the Louisville & Portland turnpike (known as Portland avenue) to the Portland wharf. The franchises of the Lexingtion & Ohio Railroad, which had been extinguished by the sale to the state, were not donated; but in the act approved March 2, 1844, in which the donation was made, and which incorporated the Louisville & Portland Railroad Company as a part of the Kentucky Institution for the Education of the Blind as an agency to operate the road donated, power was given "to do and perform every act and thing necessary and proper to carry into effect the provisions of the act, and to promote the design of this corporation." It also gave in express terms the authority for the company to purchase "passenger and burden cars," and to furnish the means of transportation, and "the right to charge and exact tolls and fees from passengers, and for transporting any baggage or thing." In an amendment approved February 10, 1846, the Louisville & Portland Railroad Company was given authority to make its "said road" from any part of the city of Louisville to any part of the town of Portland, with the consent of the municipal corporations of Louisville and Portland. There were efforts to organize the Louisville & Portland Railroad Company under this law, but they were unsuccessful.

In an act entitled "An act in relation to the Louisville & Portland Railroad," approved January 9, 1852, it is recited that the company, organized under the act of 1844, had surrendered its stock and abandoned the enterprise, and the Kentucky Institution for the Education of the Blind is invested with all the rights and powers which were given in said act of 1844 and its amendments. It was given the authority to manage "the construction and use of said road and its appendages," either by its own officers, or through the president and directors of the Louisville & Portland Railroad Company, pursuant to and under a contract which said Institution for the Education of the Blind was authorized to make with that company. It was provided in the second section of this act that the location of said railroad might be made either on the line described in said act of 1844, or on such line as the Kentucky Institution for the Education of the Blind "may choose, with the consent of the city authorities of Louisville, so that it shall extend between any points on or near the river, above or below the falls, and within two miles thereof."

The town of Portland had been united with Louisville and became a part of it. In 1853 the city council gave to the president and visitors of the Kentucky Institution for the Education of the Blind its consent to the building and operating a railroad with "*horse-power*" to Portland wharf, over any street or streets in the city lying north of Main street and west of Twelfth street. The Kentucky Institution for the Education of the Blind, under the authority given to contract

with the Louisville & Portland Railroad Company, did, by an agreement dated April 1, 1853, transfer its right to build and operate a railroad, and all rights and franchises pertaining thereto, to that company, which had then been reorganized.   The company agreed, in consideration of this transfer, to pay the Kentucky Institution for the Education of the Blind $600 per annum, and a certain part of the net profits, should they exceed $15,000 per annum; and did pay the $600 for one or more years after the road was completed.   Under the authority thus transferred the Louisville & Portland Railroad Company built, during the years 1853 and 1854, a railroad from Twelfth street over the Bank-street route, (part of which is in controversy,) and operated it with horse-power until the Louisville & Portland Railroad Company sold out to the Citizens' Passenger Railway Company, in 1866.

It was suggested in argument that the franchise granted by the state of Kentucky was to build and operate an ordinary steam railroad, and the city had no authority to grant the right to this railroad company to build and operate a street railway over its streets.   There is now a well-recognized distinction between the franchise to build and operate an ordinary steam railroad, and the franchise to build and operate a street railway over and along the level of streets in a city. But it will be observed, in this connection, that the donation was made without the franchises of the old Lexington & Ohio Railroad Company being granted with it; and there is no grant, in terms, of the use of steam-power in operating the road donated, and certainly there is no prohibition of the use of horse-power.   Indeed, whatever may have been the character of the old road on Portland avenue, which was originally built as part of the Lexington & Ohio Railroad, there can be no serious doubt of the right of the city of Louisville to indicate the power to be used in propelling cars over a new route, which could only be operated with its consent.   The legislature's grant to operate another road was conditioned upon the consent of the city.   This was indispensable, and certainly the city might protect the local public by limiting the "power" to be used.   The Louisville & Portland Railroad Company's charter nowhere requires steam-power to be used, and the utmost that can be contended for is that the authority to use steam is implied from the character of the road donated.   The charter gave authority "to do and perform every act and thing necessary and proper to carry into effect the provisions of the act and promote the design of the corporation;" and, under this authority, the Louisville & Portland Railroad Company could agree to use horse instead of steam power, even if they had the implied authority to use steam-power.   We think, therefore, the Louisville & Portland Railroad Company had the legal right to the road built over the Bank-street route, and to operate it with horse-power.   This was an existing right when the act entitled "An act reserving power to annul or repeal charters and other laws," approved February 14,

1856, was passed. The rights of this company may have been more than those usually embraced in a franchise to build and operate a street railway. Thus, it had a right to transport freight as well as passengers; and it may not have been obliged to have its road run on the same grade as the streets, or to change or alter its grade when the grade of the streets was changed. But, whatever these rights were, if they were greater than are usually embraced in a franchise to run a street railway, they were surrendered by a release executed by the Louisville & Portland Railroad Company to the city of Louisville, dated November 23, 1865. In that release, the Louisville & Portland Railroad Company waived and released all exemption from taxation, and other exclusive privileges and franchises, and agreed that—

"Said Louisville & Portland Railroad Company, their line of road, cars running thereon, and property connected therewith, shall be subject to the control of the general council of said city of Louisville, and the terms and stipulations contained in the aforesaid articles of agreement, (which said articles of agreement are referred to to be read as a part hereof,) in the same manner and to the same extent as the Market-street road, aforesaid, and as though the rights, privileges, and franchises of said Louisville & Portland Railroad Company were conferred by, and exclusively dependent on, said articles of agreement."

The "agreement," made part of this writing, was one between the city of Louisville and Isham Henderson and his associates, granting them the right to build and operate a street railway over Market and certain other streets in the city, and regulating the use and operation of said railway.

The learned counsel for the defendant insists that the Louisville & Portland Railroad Company surrendered all of its rights and franchises, and accepted from the city, who then had the right to grant them, all the franchises which it thereafter had; and hence its franchises are now repealable. There is some obscurity in the language of this release; but, read with the agreement which is made part of it, I think it surrendered all of its rights, privileges, and franchises which were inconsistent with the terms of the agreement between the city and Henderson and associates, and it surrendered its exemption from taxation, and the exclusive right which it claimed to build and operate a railroad west of Twelfth street and north of Main street in said city. But it did not surrender its existing road or route, nor did it surrender its right to operate it. This right had been given by the state, and, if surrendered to the city, could not have been re-granted by it. It, however, agreed to exercise its rights and operate its road as regulated by the terms of the agreement, and subject to the control of the general council. The words "*as though* the rights, privileges, and franchises of said company were conferred by, and exclusively dependent on, said articles of agreement," preclude a construction that the rights, privileges, and franchises were, in fact, "conferred by and exclusively dependent" upon the agreement.

This release was upon consideration that the city allowed Isham Henderson and associates (Henderson being the chief owner of the Louisville & Portland Railroad) the right to build and operate a road over Market street and certain other streets in said city, that were intended to connect with the Louisville & Portland Railroad, and be one system of city street railways. Subsequently, by an act approved January 9, 1866, the general assembly incorporated Isham Henderson and associates under the corporate name of "The Citizens' Passenger Railway Company." The Citizens' Passenger Railway Company, immediately after its organization, purchased the road, personal property, and franchise of the Louisville & Portland Railroad Company. The transfer was made through the Louisville chancery court, and the deed of the special commissioner is broad enough in terms to include all the property and rights which the Citizens' Passenger Railway had legislative authority to purchase.

It is important to consider and determine, at this point, exactly what the Citizens' Passenger Railway Company obtained by its purchase. The charter to the Citizens' Passenger Railway Company was given for the purpose of utilizing the previous agreement between Henderson and associates and the city of Louisville, and to unite the Louisville & Portland Railroad with the system of railways authorized by the agreement; but the powers granted were much broader, and intended to allow the system to be extended as the public necessity might thereafter require. The charter's existence was limited to 30 years by the first section, and in the second it was authorized and empowered, with the consent of the general council of Louisville, and upon terms prescribed by it, to construct, maintain, and operate single or double track street railways "in, on, over, and along" any street or streets, highway or highways, within the then or future limits of the city. In the same section, and immediately following, it is provided that "said corporation is also authorized to lease or purchase the Louisville & Portland Railroad, its franchise, and all property appertaining thereto." The corporate life of the Louisvillle & Portland Railroad Company was without limit, and the Citizens' Passenger Railway Company was limited to 30 years. Did this authority and the purchase under it extend the corporate life of the Citizens' Passenger Railway Company and authorize it to operate the Louisville & Portland Railroad as a corporation after the expiration of the 30 years? We think not. The Citizens' Passenger Railway Company purchased the road, and the rights and privileges attached thereto, and subject to the agreement made with the city of Louisville and others, and the franchise of the Louisville & Portland Railroad Company, which did not pertain to its own corporate functions and existence. The latter remained in the Louisville & Portland Railroad Company, and did not pass by the purchase. If the Citizens' Passenger Railway Company had leased instead of purchasing the road, it would have been quite clear that the road would have

been operated under the corporate authority given to the Citizens' Passenger Railway Company, and not under the corporate authority of the Louisville & Portland Railroad Company. I think this is equally clear, though the Citizens' Passenger Railway Company purchased, instead of leasing, the road and its property and franchises.

We have been referred to many cases in which the courts have construed acts consolidating two or more existing corporations into one, and some acts where the legislature has authorized a merger of the stock of an existing corporation into another existing corporation, and united the property and management of the two corporations into one. In these cases it has often become important to determine whether the act authorizing the consolidation or merger created a new corporation and dissolved the old ones, or whether the legislative intent was to leave the original corporation still existing, with its rights, privileges, and immunities. This is always a question of intent, to be gathered from the language of the act and circumstances surrounding each enactment. Thus, in *Railroad Co.* v. *Maine*, 96 U. S. 499, and *Railroad Co.* v. *Georgia*, 98 U. S. 359, it was determined that these acts of consolidation were new charters, and subject to amendment or repeal, although the act of consolidation gave, in terms, all of the franchise, privileges, and immunities of the old charters which were passed without the reservation of the state to amend or repeal. In *Tomlinson* v. *Branch*, 15 Wall. 462, and *Central R. R.* v. *Georgia*, 92 U. S. 665, the supreme court decided that it was not the legislative intent to dissolve the existing charters and create a new one, and hence the privileges and immunities of the original charters, which were not subject to the reserved right of the state to repeal or annul, could not be changed without the consent of the corporation. The conclusions in these cases, as in the other cases, were arrived at by a construction of the legislative act, construed by the light of the surrounding circumstances in each case.

The Citizens' Passenger Railway Company purchased of the Louisville & Portland Railroad Company its road, its rights, and privileges, and indeed all of its rights and franchises; except it did not get from it the right to operate the road as a corporation. That came from its own charter, and not by the purchase. This right being granted to the Citizens' Passenger Railway Company, with the reserved right of repeal or amendment, the state of Kentucky has the constitutional right to repeal this corporate right, in whole or in part.

*Greenwood* v. *Freight Co.* 105 U. S. 13, is a very instructive case upon this question. There the supreme court sustain as constitutional an act of the general assembly of Massachusetts which repealed the charter of a street railway company that had built and was operating its road in Boston, and authorized another company, then organized, to take its track within four months, "subject to the laws relating to the taking of land by railroad companies, and the compensation to be made therefor." The court, in its opinion, says

"That whatever right, franchise, or power in the corporation depends for its existence upon the granting clauses of the charter is lost by repeal. * * * It results, from this view of the subject, that whatever right remained in the Marginal Company to its rolling stock, its horses, its harness, its stables, the debts due to it, and the funds on hand, if any, it no longer had the right to run its cars through the streets, or on any of the streets, of Boston. It no longer had the right to cumber those streets with a railroad track which it could not use, for those belonged by law to no person of right, and were vested in defendants only by virtue of the repealed charter."

There is an intimation in this case that the right to use the streets for operating a street railway is not to be valued in estimating the value of the property of a railway company. This seems to be the rule in Massachusetts. *Metropolitan R. R.* v. *Highland Ry. Co.* 118 Mass. 290. This rule must be upon the idea that this right of way is held at the pleasure of the state, and when the right is withdrawn by the state there is nothing to value; or, where there is a right reserved in the state to allow another company to use the track upon paying compensation, this right to use the streets, given the first company, should not be paid for, as it was given for the public benefit.

The Louisville City Railway Company subsequently, in 1872, purchased of the Citizens' Passenger Railway Company all of its roads, property, and franchises; but this did not give that railway company a right which the Citizens' Passenger Railway Company had not purchased and did not have. The Louisville City Railway Company, operated the road, as well as the others purchased, under its own charter, as to the corporate right to operate a street railway, and not under either the Louisville & Portland Railroad Company's or the Citizens' Passenger Railway Company's charter. The Louisville City Railway Company's charter was passed after the act of 1856, and is therefore, like the Citizens' Passenger Railway's charter, subject to amendment and repeal.

The fact that the Louisville & Portland Railroad Company purchased of the Kentucky Institution for the Education of the Blind its right to build and operate this railroad, does not, I think, make any difference. The corporate right to operate this road as a corporation was given the Louisville & Portland Railroad Company by the state, and was not purchased by it. But if it had been purchased by it of the Kentucky Institution for the Education of the Blind, it would make no difference; since the question is whether the corporate right was authorized to be, and was, sold to the Citizens' Passenger Railway Company.

Although the Louisville City Railway Company has no right, as a corporation, to build and operate a street railway over the route in controversy, yet, if there is an existing right of way over this route, belonging either to the Louisville City Railway, its stockholders, or the mortgagee of the Citizens' Passenger Railway Company, it is property, which should be protected, and cannot be taken except by due process of law. A legislative enactment, giving this right of way

to the Central Passenger Railway Company, if it is the property of the Louisville City Railway Company, is not due process of law. The Citizens' Passenger Railway Company obtained an existing right of way over this route by its purchase, and this company continued to operate the route until it sold to the Louisville City Railway Company, June 1, 1872, except between April 1, 1868, and January 1, 1870. The road was not operated at all between April 1, 1868, and until some time in December, 1869. This was in consequence of an arrangement between the Louisville City Railway Company and the Citizens' Passenger Railway Company not to operate the road; and for this the Louisville City Railway Company paid the Citizens' Passenger Railway Company a *bonus* of $750 per month. The Louisville City Railway Company had, and still has, a line of road along Portland avenue, which was about 600 feet north of the Bank-street route, and paid this sum to get rid of a competing road. After the purchase, the Louisville City Railway Company operated the Bank-street route only a month, and have not operated the route since July 8, 1872. Bank street, between Seventeenth and Thirty-third streets, was then unpaved; and in 1873 that part of the street between Twenty-sixth and Thirty-third streets was ordered to be paved. This was done by J. C. Dennis, with whom was Isham Henderson as a secret partner in 1873-74. The contractors took up that part of the road which was in the street which they were paving. Subsequently, perhaps the next year, another part of Bank street was paved, by order of the council, and the road in this part was taken up by the contractors. The Louisville City Railway Company sold the iron rails which were upon this entire route. This was in 1873 or 1874; and the company has never relaid any part of the track over the route in controversy. It never attempted to do anything towards re-establishing or operating this route until the summer of 1882. The company then attempted to lay cross-ties upon part of this route, but was stopped by the police of the city. This attempt was made, however, after there was a move made by another railway company to obtain the route and operate a street railway over it. The struggle then commenced for the possession and control of this route seems to have continued to the present time.

When the act of March 14, 1884, was passed, there had been a non-user of this route for nearly 12 years. The parties have taken a great deal of testimony to show the motive of the Louisville City Railway Company in this non-user. There is no controversy as to the length of the non-user; and it is clear, from the evidence, that at the time of the purchase the Louisville City Railway Company did not intend then to continue to operate the route as a street railway. Its then value to that company was that it should remain idle, and not be a competing line with the Portland-avenue road. But whether this non-user was intended to be only temporary, and to cease when the route became settled, or the general council of the city required

the route to be operated; or whether the non-user was intended to be permanent and the route abandoned as a street railway,—are questions of intent, and always difficult to determine after the event.

Mr. Davison, who was the president of the Louisville City Railway Company at the time of the purchase, and until 1878, has given his deposition; and his evidence is to the effect that the Louisville City Railway Company never intended to operate this road as a street railway again, but the right to the route was claimed because it was thought to be of some value as a connection to a bridge which the Louisville & Portland Railroad Company had legislative authority to build across the Ohio river. Mr. Davison evidently thought the Bank-street route of no value to his company as a street railway, except to destroy it, and thus prevent what he calls "cut-throat competition." He is sustained by the fact proven, that the Louisville City Railway Company made two mortgages, one in 1875 and the other in 1877, which purported to convey all of its property; and this route was not mentioned in either of them.

There is evidence to the effect that the Louisville City Railway Company was in pecuniary difficulties during most of this time, and it could not have relaid this track without very considerable outlay, and that there was no public necessity for the outlay, as the Portland-avenue road accommodated the travel.

Mr. Littel, who is and has been for years the superintendent of the Louisville City Railway Company, says that the company had the intention of relaying the track and operating the road whenever the settlements along that route were sufficient to sustain or require such a road, and states that he and Mr. Davis, who is the president of the road and has been since 1878, and who lives in New York, examined the route on two occasions to see if the settlements along the line would justify the route being relaid and operated. He explains that the iron rails sold were "T" rails, and unsuitable to be relaid on a paved street, and says that in laying a track on Bank street, between Sixteenth and Seventeenth streets, in the fall of 1876 or the spring of 1877, he put the track on the side of the street, so that it might be one of a double track when the Bank-street route was relaid. The permission to lay this track as part of another route was obtained from the city council; but the language of the ordinance, which was drawn by Mr. Littel, is such as neither to waive the old right nor claim it. Mr. Littel says that this was done intentionally.

I am of opinion that the weight of evidence is that the Louisville City Railway Company did not intend to operate this route as a street railway, and that its purpose was to abandon it as a street-railway route; and this purpose was not changed until there was a prospect of another railway getting the right to build and operate a road over this route.

The right which the state gives a street-railway company to main-

tain and operate its road over streets is a peculiar one, and in many respects unlike the right of way which one person has over the land of another. It is a right which may be given without the consent of the person who owns the fee-simple of the land over which the street runs, and without the consent of the lot-owners on the street. It is considered to be a legitimate use of a street, and is given for the accommodation of the public, and to facilitate travel. The ordinary carriage has the right of way over the street when using and traveling over it. The street car has this and something more; it has a right superior to other vehicles to run over its own tracks, and this right is exclusive as against other street cars, unless they have obtained a special right to use the tracks. Railway (street) companies have also the right to occupy the streets to an extent necessary to lay and repair their tracks. These companies, having expended money and labor in building and maintaining their roads, are entitled to a fair compensation for their use by the public; but, in estimating this compensation, no estimate of the value of the use of the street should be made, because that is given to facilitate travel and for the public benefit, and not for the private use and benefit of the railway company. *Jersey City & B. Ry. Co.* v. *Jersey City & H. Ry. Co.* 20 N. J. Eq. 70. The rules which apply to the non-user or abandonment of a right of way or other like easements, that are held and owned for private use and benefit, should not be applied with strictness to this kind of right, which is given and held for the public use and benefit. An abandonment should be much more readily inferred in such a case than where the easement is held and owned for private use and benefit. Indeed, I think the mere non-user of this route for 10 years, without the consent of the state or the city, should be sufficient evidence of abandonment, and authorize the state to assume that fact, and grant the right to another.

The only case we have seen which touches the point under consideration is *Hestonville R. Co.* v. *City of Philadelphia*, 89 Pa. St. 215. In that case, a street-railway company had the right expressly given it by the state to lay and operate a double-track railway through a part of Callowhill street, Philadelphia. The company obtained the consent of the city council and laid down a double track, and operated its road for some years. The company then took up one of the tracks, and operated its road over only one track in that street for 10 years, and then relaid the other track which it had taken up. The city of Philadelphia brought suit in equity to enjoin the company from relaying and operating its road over this double track, and the court of appeals, reversing the lower court, held that such a suit could not be sustained. It will be observed that the state took no action in the matter, and there was nothing in the facts that indicated an abandonment of a double track. The company operated its road continuously, and, in doing so, it changed from a double to a single track, and then back again to a double track. This is merely a change in

the mode of exercising a right given by the state, and is very like that of a change in the rails or cars used. The state and the city, as the representatives of the public, gave the use of the Bank-street route; and, if that right had been abandoned or lost by the action, or the non-action, of the Louisville City Railway Company, it would revert to the state as representing the public. It was proper for the state to assert its control of this right of way, if in fact it had reverted. This was a legislative act; but, if the right had not reverted by abandonment, or other cause, then the legislative department could not, by a statute, transfer a right of way which was private property from one to another. We have seen that the Louisville City Railway Company had abandoned whatever right it had to operate a street railway over these streets; and hence the state could legally grant this right to another company, for a like purpose.

The act of March 14, 1884, was necessary to give to the Central Passenger Railway Company any right to use this route for a street railway, even though the Louisville City Railway Company had no claim or right; and that act is not unconstitutional as impairing the obligation of a contract, or depriving any one of property without due process of law, for the reasons given.

The complainant, Mrs. Henderson, as the owner of the mortgage bonds issued by the Citizens' Passenger Railway Company, has no other or greater right than the Louisville City Railway Company has. She holds her mortgage lien, upon the right to use this route as a street railway, subject to the contingency that the right might be abandoned or lost by the mortgagor or its vendee. The injunction in her case was granted before the passage of the act of March 14, 1884, or the ordinance of January 25, 1884, and was granted *ex parte*, and without notice. The injunction in *Central Passenger Ry. Co.* v. *Louisville City Ry. Co.* was also granted *ex parte*, and without notice. I have therefore considered the questions involved as if the existing injunctions were restraining orders under the practice of this court, and the motions now made were for injunctions upon notice, after bill and answer.

In the case of *Henderson* v. *Central Passenger Ry. Co.* the motion to dissolve the injunction should be and is sustained. The motion for an injunction on the cross-bill of the Louisville City Railway Company is refused. In the case of *Central Passenger Ry. Co* v. *Louisville City Ry. Co.* the motion of the defendant Louisville City Railway Company, to dissolve the injunction, is overruled.