## LOUISVILLE TRUST CO. v. CITY OF CINCINNATI.

(Circuit Court of Appeals, Sixth Circuit. October 5, 1896.)

No. 426.

1. RES JUDICATA.
   A mortgagee of street-railroad franchises is not concluded by a decree affecting their validity to which the mortgagor only was a party.

2. FEDERAL COURT—FOLLOWING STATE DECISION.
   Where a contract or obligation has been entered upon before there has been any judicial construction of a state statute upon which the contract or obligation depends by the highest court of the state, a federal court obtaining jurisdiction of a question touching the validity, effect, or obligation of such a contract will, while leaning to an agreement with the state court, exercise an independent judgment as to the validity and meaning of such contract, and will not necessarily follow opinions of the state court construing such statute, if such decisions were rendered after the rights involved in the controversy originated.

3. INCLINED PLANE RAILWAY—OHIO STATUTES.
   Act Ohio March 30, 1877, § 1, provided that an inclined plane railway company organized under Act May 1, 1852, should have power to hold, lease, or purchase, and maintain and operate, such portion of any street railroad leading to or connected with it as might be necessary for its business, "upon the same terms and conditions on which it holds, maintains and operates its inclined plane." Held, that the "terms and conditions" referred to were those contained in the act of 1852, and that the later act did not extend the term of any street grant owned by such a company, nor, because, in Ohio, there is no limit to the duration of a corporation, confer upon it a perpetual right to continuously occupy the streets upon which it then had tracks, and any other streets occupied by the lines of other companies which might be thereafter leased or purchased.

4. SAME.
   The later act had the effect of validating any previous grants or contracts under which an inclined plane railroad company then maintained and operated any street railroad leading to or connected with it.

5. STREET RAILWAYS—GRANT OF FRANCHISES.
   A grant by the legislature to the local authority of the right to impose terms and conditions upon a railroad company seeking to occupy any public street or highway, and to exclude it altogether unless resort be had to condemnation, impliedly gives the right to limit the duration of such occupancy.

**6.** SAME—DURATION OF TERM.

The fact that the corporate life of a corporation is for an unlimited term does not abridge its capacity to accept a grant of a street franchise for a shorter term.

**7.** SPECIAL ACT.

Act Ohio March 30, 1877, applying to all inclined plane railroad companies organized under Act May 1, 1852, and confirming all such companies in their ownership and operation of street railroads, so far as such maintenance and operation had been invalid by defect of power, is not invalid as a special law.

**8.** STREET RAILWAYS—ABANDONMENT OF FRANCHISE.

The failure for over 20 years to operate a railway on certain streets included in a franchise granted raises a presumption of an abandonment of the grant so far as concerns those streets.

**9.** SAME—ESTOPPEL OF CITY.

Act Ohio March 30, 1877, provided that no motive power other than animal should be used upon any street railroad held or acquired thereafter by an inclined plane railway without the consent of the board of public works in any city having such a board. *Held,* that the fact that a company, acting under resolutions of the board of public works giving its consent thereto, expended large sums in changing the motive power from horse to electricity, did not estop the city from denying the company's right to occupy the streets, nor operate as an extension of expired grants of franchises; the law at the time requiring grants of street franchises to be made by city ordinance.

**10.** EVIDENCE—JUDICIAL RECORD.

The judge of the circuit court may, in order to determine his power to grant relief in regard to certain property, consider the record of proceedings in that court wherein a receiver was appointed for the property.

**11.** COURTS—CONFLICT OF JURISDICTION.

A state court has no power to issue process against property already in the hands of a receiver appointed by the federal court.

Appeal from the Circuit Court of the United States for the Western Division of the Southern District of Ohio.

This suit involves the validity and duration of the street franchises claimed by the Cincinnati Inclined Plane Railway Company, a corporation organized and existing under the laws of the state of Ohio, and owning and operating a line of street railway occupying certain streets in the city of Cincinnati. The street grants claimed and occupied by the said railway company are held and claimed under and by virtue of acts of the legislature of Ohio and ordinances of the city of Cincinnati. The questions arise under an original bill filed by the Louisville Safety-Vault & Trust Company, a corporation organized and existing under the laws of the state of Kentucky. The complainant company is the trustee under a mortgage executed by the Cincinnati Inclined Plane Railway Company, January 1, 1889, duly recorded. This mortgage was made for the purpose of securing an issue of $500,000 in negotiable bonds, the principal being payable in 1914, with interest coupons attached, payable semiannually. Of these bonds $375,000 have been issued and are in the hands of unknown holders, for value. The remainder are held by the complainant trust company for the purpose of taking up a prior mortgage made by the same company and secured upon the same property. The property mortgaged embraces all of the property of the mortgagor company, including its street franchises, rights of way, leases, contracts, iron rails, street cars, and equipments of every kind and character. The bill alleges, and the fact is, that the value of the property mortgaged consists principally in its street franchises and rights of way; that, aside from the value of the iron rails, forming a fixed track upon the streets of the city, the rolling stock and other equipment of the company is of comparatively small value, and wholly insufficient, if removed from the streets of Cincinnati, to secure the bonds outstanding. The bill alleges that the defendant, the city of Cincinnati, denies the right of said Cincinnati Inclined Plane Railway Company to further occupy the streets

of the city with is rails and equipment, and claims that the said railway company is a trespasser upon the streets mentioned in the bill and is unlawfully maintaining and operating its line of street railway thereon, and through its officers and agents threatens to remove said tracks and appliances for the operation of the cars thereon, and to grant the right to use the same to a rival company holding and operating a parallel competing line in said city. The bill charges that the actings and doings of the said defendant are wholly unlawful and contrary to equity and good conscience; that they are very hurtful to said railway company's credit and business, and tend greatly to depreciate its bonds in the market and destroy the security thereof, and thereby cripple it in its ability to serve the public; and that, if permitted to remove its tracks from the streets, as it threatens to do, it will almost wholly destroy the security conveyed to the complainant, and upon the faith of which the bonds of the said company have been negotiated. The bill sets out the charter and other provisions made by the legislature of Ohio and the ordinances of the city of Cincinnati under which the said inclined plane railway company claims a right to continue the exercise of its franchises as a street-railway company upon the streets of Cincinnati, and insists that its said street rights are perpetual, or are at least for a term not yet expired, and prays that the city be restrained from its threatened acts of destruction, and from granting to any other company the street franchises lawfully owned and exercised by the said mortgagor company. The answer of the city is in substance an assertion that the street rights of the said inclined plane railway company were either invalid, as having been granted without authority, or have expired by limitation, and insists that the said company no longer has any legal right to occupy the streets in controversy with its tracks, equipments, etc. It sets out that this contention has been heretofore the subject of a direct litigation between the city and the mortgagor corporation, and that in said suit it has been determined finally that certain of the street rights claimed had expired by limitation, and that certain other street grants claimed had never been lawfully granted and were void; that in said suit it was adjudged that the said company had no longer a right to occupy the controverted streets against the will of the city; and that an injunction had been awarded to prevent the further occupation thereof, 'though this injunction had been suspended until further direction of the court. The decree thus relied upon as an answer to the bill of the complainant was pronounced in the case of City of Cincinnati v. Cincinnati Inclined Plane Ry. Co., at a general term of the superior court of Cincinnati, and is reported in 30 Wkly. Law Bul., at page 321 et seq. An appeal was taken from that decree to the supreme court of Ohio, and there affirmed, "for the reasons stated in the opinion of the superior court." See 52 Ohio St. 609, 44 N. E. 327. The answer further insists that, whether the United States courts are obliged to follow the opinion of the supreme court in the case cited or not, the conclusions therein reached were right and proper, and that, if this court shall exercise an independent judgment in respect to the validity, extent, and duration of the street franchises claimed by the inclined plane railway company, the opinion of the supreme court of the state properly interprets the street contracts of that company, which is therefore a trespasser upon the streets, and subject to be removed as such. Upon the final hearing the circuit court dismissed the bill. 73 Fed. 716.

Humphrey & Davie and St. John Boyle (E. A. Ferguson, of counsel), for appellant.

Fred. Hertenstein and W. H. Whittaker (John C. Healy and J. D. Brannan, of counsel), for appellee.

Before TAFT and LURTON, Circuit Judges, and HAMMOND, J.

LURTON, Circuit Judge, after making the foregoing statement of facts, delivered the opinion of the court.

The questions involved are as to the extent, validity, and duration of the contract rights of the Cincinnati Inclined Plane Railway Company under which it occupies, with its tracks, poles, wires,

and other equipment, certain streets of the city of Cincinnati, and upon which it maintains and operates a street-car line. That these street easements originate in certain statutes of the state of Ohio and certain ordinances of the city of Cincinnati does not affect their character as contracts entitled to the protection afforded by the constitution of the United States. The grant of a right to enter upon and occupy a public street with the necessary tracks, poles, wires, and equipment of an electric street railway is a grant of a typical easement in property, and as such is a contract right capable, in the absence of express restrictions, of being sold, conveyed, assigned, or mortgaged, and is, therefore, a right entitled to all the protection afforded other property or contract rights. Such a grant, as we had occasion to decide in Detroit Citizens' St. Ry. Co. v. City of Detroit, 22 U. S. App. 570–580, 12 C. C. A. 365, 372, and 64 Fed. 628, 635, may be for a term longer or shorter than the corporate life of the company receiving it, the duration of the estate being dependent upon the terms of the grant and the power of the grantor to make it. We then said that there was "nothing in the nature of the property rights involved in a grant of an easement in the streets for street-railway uses which distinguishes it from other property acquired by a corporation in the exercise of its franchises." In Railroad Co. v. Delamore, 114 U. S. 501, 5 Sup. Ct. 1009, it was held that a grant by a municipal corporation to a railway company of a right of way through certain streets of the city, with the right to construct its railway thereon and maintain and occupy them in its use, is a franchise which may be mortgaged, and would pass to a purchaser at a sale under a foreclosure of the mortgage. There is nothing in the law of Ohio which in any way contravenes the right of a railway company to mortgage its street easements, or which would prevent such easements from passing to a purchaser at foreclosure sale. It therefore follows that the complainant under the mortgage mentioned has acquired the substantial right in the street easements of the mortgagor company, and cannot be deprived of this security by a proceeding directly impeaching their validity and duration without being made a party thereto. It is true that a grantor can transfer no greater estate or interest than he has, and that the title in the grantee's hands must be subject to all the burdens and limitations which rested upon it at the time of the conveyance. But in Keokuk & W. R. Co. v. Missouri, 152 U. S. 301–314, 14 Sup. Ct. 592, 597, Mr. Justice Brown in delivering the opinion of the court, said:

"While a mortgagee is privy in estate with a mortgagor as to actions begun before the mortgage was given, he is not bound by judgments or decrees against the mortgagor in suits begun by third parties subsequent to the execution of the mortgage, unless he or some one authorized to represent him, like the trustee of a mortgage bondholder, is made a party to the litigation, although it would be otherwise if the mortgage were executed pending the suit or after the decree."

See also, Campbell v. Hall, 16 N. Y. 575; Hassall v. Wilcox, 130 U. S. 493, 9 Sup. Ct. 590; Trust Co. v. Folsom (decided by this court at this term) 75 Fed. 929.

The mortgage under which the complainant is the trustee was executed before the suit in the state court was begun, and we think there is no reason why a mortgage of property interests, such as the street grants claimed by the mortgagor company, should be concluded by a decree to which only the mortgagor was a party, than if the mortgage had been on a different character of estate. Baltimore Trust & Guarantee Co. v. Mayor, etc., of City of Baltimore, 64 Fed. 153.

The learned counsel for the city have not relied upon the decree of the state court as an adjudication binding upon the complainant, but they have insisted that the opinion of the Ohio supreme court in the case of City of Cincinnati v. Cincinnati Inclined Plane Ry. Co. is to have much the same effect, and as effectually prejudges the question here involved, as if the city of Cincinnati had made the present complainant a party defendant to that suit. The contention is that it is the duty of this court to accept that opinion as a conclusive construction of the charter powers of the city of Cincinnati, and of the Cincinnati Inclined Plane Railway Company, and likewise a conclusive interpretation of the scope, effect, and duration of the various contracts or ordinances under which the mortgaged easements and franchises originated. If this be true, the constitutional right of the complainant, as a citizen of a state other than Ohio, to have its rights as a mortgagee defined and adjudged by a court of the United States is of no real value. If this court cannot for itself examine these street contracts, and determine their validity, effect, and duration, and must follow the interpretation and construction placed on them by another court in a suit begun after its rights as mortgagee had accrued, and to which it was not a party, then the right of such a mortgagee to have a hearing before judgment and a trial before execution is a matter of form without substance. The better forum for a suitor so situated would be a court of the state. Upon appeal to the supreme court its former opinion might be reconsidered, and judgment rendered according to right and justice, notwithstanding a former erroneous opinion interpreting the same legislative acts and construing the same contractual ordinances. But it is said that the questions here involved are as to the validity and proper interpretations of Ohio statutes, Ohio charters, and local city ordinances, and that the supreme court of the state is pre-eminently the proper tribunal for the determination of all such questions, and that the courts of the United States accept the interpretation of a state statute by the highest court of the state as settling its validity and meaning; and the cases of Leffingwell v. Warren, 2 Black, 599; Norton v. Shelby Co., 118 U. S. 425, 6 Sup. Ct. 1121; In re Duncan, 139 U. S. 449, 11 Sup. Ct. 573; City of Detroit v. Osborne, 135 U. S. 492, 10 Sup. Ct. 1012; Railroad Co. v. Roberson, 22 U. S. App. 187, 9 C. C. A. 646, and 61 Fed. 592; Nason's Adm'r v. Railroad Co., 22 U. S. App. 220, 9 C. C. A. 666, and 61 Fed. 605; Sanford v. Poe, 37 U. S. App. pp. 379, 16 C. C. A. 305, and 69 Fed. 546,—as well as other cases of the same character, are cited to support this contention.

The general rule touching the duty of United States courts to

adopt and follow the construction of state statutes, announced by the highest court of the state whose statute is involved, is well settled, and the rule is over and over again stated in the cases cited, and in many others. But there are certain well-recognized exceptions to this general rule. One of them is that if contracts and obligations have been entered into upon the faith of existing judicial constructions of state statutes, the courts of the United States will not regard themselves as under any duty to conform to later decisions reversing earlier opinions, upon the faith of which citizens of other states have acquired rights or assumed liabilities. Douglass v. Pike Co., 101 U. S. 677. So, where a question involved in the construction of a state statute practically affects those remedies of creditors which are protected by the constitution, courts of the United States will exercise an independent judgment as to the meaning of such statutes, and will not be bound by the decisions of state courts, and this, whether the case arises upon a writ of error under the twenty-fifth section of the judiciary act, or is a case where the jurisdiction was dependent upon citizenship alone. Butz v. City of Muscatine, 8 Wall. 575. So we think another well-grounded exception exists where contracts and obligations have been entered upon before there has been any judicial construction of the statutes upon which the contract or obligation depends by the highest court of the state whose statute is involved. In such a case, if a court of the United States obtains jurisdiction of a question touching the validity, effect, or obligation of such a contract, it will, while "leaning to an agreement with the state court," exercise an independent judgment as to the validity and meaning of such contract, although the meaning and validity of state statutes may be an element in the case, and will not be bound to follow opinions of the state court construing such statute, if such decisions were rendered after the rights involved in the controversy originated. Burgess v. Seligman, 107 U. S. 20, 2 Sup. Ct. 10; Pleasant Tp. v. Aetna Life Ins. Co., 138 U. S. 67, 11 Sup. Ct. 215.

In Burgess v. Seligman, the case involved the construction of a Missouri statute, which provided that persons holding stock in Missouri corporations as collateral security should not be liable for unpaid assessments on such stock. Three suits were brought against Seligman for unpaid assessments. Two of these suits were in the state court and the third was in the United States circuit court. Seligman held the stock as collateral security, having received it as collateral from the corporation issuing it. He claimed that under the Missouri statute referred to, he was exempt from liability to creditors for unpaid assessments. This view was adopted by the United States court, and from the judgment the creditor appealed to the supreme court. Pending this appeal the two suits in the state court were decided adversely to Seligman, and appealed to the supreme court of the state. The Missouri court affirmed the judgments against Seligman, holding that under a proper construction of the Missouri statute the exemption did not apply to one holding unpaid shares of stock as collateral security from the corporation itself. These decisions were delivered before Seligman's

Case, pending in the supreme court of the United States, came on to be heard. Upon the trial in the latter court it was pressed upon the court that the opinion of the supreme court of Missouri, construing a Missouri statute, conclusively determined its meaning. Concerning this claim, the court, through Mr. Justice Bradley, said:

"We do not consider ourselves bound to follow the decision of the state court in this case. When the transactions in controversy occurred, and when the case was under the consideration of the circuit court, no construction of the statute had been given by the state tribunals contrary to that given by the circuit court. The federal courts have an independent jurisdiction in the administration of state laws, co-ordinate with and not subordinate to that of the state courts, and are bound to exercise their own judgment as to the meaning and effect of those laws. The existence of two co-ordinate jurisdictions in the same territory is peculiar, and the results would be anomalous and inconvenient but for the exercise of mutual respect and deference. Since the ordinary administration of the law is carried on by the state courts, it necessarily happens that by the course of their decisions certain rules are established which become rules of property and action in the state, and have all the effect of law, and which it would be wrong to disturb. This is especially true with regard to the law of real estate and the construction of state constitutions and statutes. Such established rules are always regarded by the federal courts, no less than by the state courts themselves, as authoritative declarations of what the law is. But where the law has not been thus settled, it is the right and duty of the federal courts to exercise their own judgment, as they also always do in reference to the doctrines of commercial law and general jurisprudence. So, when contracts and transactions have been entered into, and rights have accrued thereon under a particular state of the decisions, or when there has been no decision of the state tribunals, the federal courts properly claim the right to adopt their own interpretation of the law applicable to the case, although a different interpretation may be adopted by the state courts after such rights have accrued. But even in such cases, for the sake of harmony and to avoid confusion, the federal courts will lean toward an agreement of views with the state courts, if the question seems to them balanced with doubt. Acting on these principles, founded as they are on comity and good sense, the courts of the United States, without sacrificing their own dignity as independent tribunals, endeavor to avoid, and in most cases do avoid, any unseemly conflict with the well-considered decisions of the state courts. As, however, the very object of giving to the national courts jurisdiction to administer the laws of the states in controversies between citizens of different states was to institute independent tribunals, which it might be supposed would be unaffected by local prejudices and sectional views, it would be a dereliction of their duty not to exercise an independent judgment in cases not foreclosed by previous adjudication. As this matter has received our special consideration, we have endeavored thus briefly to state our views with distinctness, in order to obviate any misapprehensions that may arise from language and expressions used in previous decisions."

Some significance may have been attached to the fact that the Missouri decisions were not made until after the case in the circuit court had been tried and decided. In that particular the case is to be distinguished from the one at bar. But that fact was not the vital fact in the case. Before the pending case was heard upon writ of error, the supreme court of Missouri had reached a contrary conclusion as to the meaning of the statute involved from that entertained by the United States circuit court. The question as to the right meaning of that statute was the question involved upon the writ of error. If there was any fixed principle by which the courts of the United States were bound under all circumstances to follow the state court in the construction of state statutes, where contracts had not been

entered into upon the faith of earlier and conflicting decisions, the mere circumstance that such decision was made after the circuit court had heard and decided the case was not enough to justify a departure from the rule when the same case came on to be heard in the supreme court.

In Sanford v. Poe, 37 U. S. App. 378, 16 C. C. A. 305, and 69 Fed. 546, the circuit court construed the act there involved before the state court had made any decision. But when that court was advised of that decision, a rehearing was allowed, and the former opinion revoked, upon the express ground that it was the duty of the United States courts to adopt and follow the Ohio court as to the construction of the Ohio tax law. 64 Fed. 9. This action of the circuit court was approved by this court, upon the ground that the suit involved no rights or contracts entered into before such decision. 37 U. S. App. 385, 16 C. C. A. 305, and 69 Fed. 546. We accordingly find that Mr. Justice Bradley states the rule to be that, "when contracts and transactions have been entered into, and rights have accrued thereon under a particular state of the decisions, or when there has been no decision, of the state tribunals, the federal courts properly claim the right to adopt their own interpretation of the law applicable to the case, although a different interpretation may be adopted by the state courts after such rights have accrued." The principle we deduce from this decision finds support in the subsequent case of Pleasant Tp. v. Aetna Life Ins. Co., 138 U. S. 67, 11 Sup. Ct. 215, where a decision of the state court, made before action begun, was relied upon as determining the proper interpretation of the state statute involved. In that case the question involved the constitutionality of an Ohio statute, authorizing Pleasant township to borrow money and issue bonds for the purpose of building a railroad. Under this statute the bonds in question were issued. Subsequently the supreme court of Ohio, but after the bonds had been issued, held the statute void under the Ohio constitution. Wyscaver v. Atkinson, 37 Ohio St. 80. In a suit against the township upon certain of these bonds, this decision of the Ohio court was relied upon as a conclusive determination of the invalidity of the act under which the bonds had been issued. The opinion of the supreme court was by Mr. Justice Brewer, who said:

"We are not concluded by that determination. In matters of contract, especially, the right of citizens of different states to litigate in the federal courts of the various states is a right to demand the independent judgments of those courts. The settled law in that respect is well stated in the case of Burgess v. Seligman, 107 U. S. 20-33, 2 Sup. Ct. 10."

Upon an original consideration of the question the supreme court found itself in accord with the supreme court of Ohio, and the acts under which the bonds had been issued were held void as a result of the independent judgment of the court.

It is said that this case involves no question as to a law impairing the obligation of contracts, and no questions of commercial law, but that the statutes and ordinances involved concern alone the powers of a municipality of the state of Ohio, and those of a private corporation of the same state, and that the validity and meaning of such

acts and ordinances is peculiarly a question which should be determined by courts of the state. The answer to that is that contracts and obligations have been entered into before the courts of Ohio had judicially determined the nonvalidity of certain ordinances upon which those contracts rest, or construed the meaning of the law under which the mortgagor corporation was organized, or the later act enlarging its powers. The validity, effect, and duration of the street easements granted or claimed under these laws and ordinances is a question which this complainant is entitled to have decided by the courts of the United States, and the opinion of the supreme court of Ohio, while entitled to the highest respect as a tribunal of exalted ability, can be given no greater weight or respect than its reasoning shall demand, where the contract rights of a citizen of another state are involved, who was neither a party nor privy to the suit in which that opinion was delivered. The special fact, therefore, which justifies us in determining for ourselves the true meaning and validity of the Ohio statutes and city ordinances, out of which the rights of this complainant spring, is the fact that it is a citizen of another state, and that the contract under which it has acquired an interest originated prior to the judicial opinion relied upon as foreclosing our judgment.

This brings us to a consideration of the statute and city ordinances upon which depend the contract rights of the Cincinnati Inclined Plane Railway Company to occupy the streets of Cincinnati. Prior to 1860 there were no statutory provisions in Ohio under which street-railway companies proper could be organized, and no statutory laws specially affecting street railroads. Such companies as were incorporated to operate street railways prior to April 10, 1861, were formed under the general act for the incorporation of steam railroad companies of May 1, 1852. Neither were there any statutes regulating the organization, powers, or rights of inclined plane railway companies as such, until the act of April 12, 1876, and companies for the maintenance and operation of railway companies of the latter description were likewise organized under the steam railway act of May 1, 1852, prior to the passage of the inclined plane railway act of April 12, 1876. An inclined plane railway is best described by its name. Companies organized to build and maintain such a railway were intended for the purpose of constructing and operating an inclined plane by which passengers in cars were carried up from a valley or basin to the top of a hill or elevated plateau having a steep ascent. The well-known fact that Cincinnati is situated in a level plane, surrounded by a high and steep plateau, made it important that some means should be adopted by which easy communication might be had between the city and its hill suburbs. In the case of City & Suburban Tel. Ass'n v. Cincinnati Inclined Plane Ry. Co., 23 Wkly. Law Bul. 165, Judge Taft thus describes the situation of Cincinnati, and the utility of such a public work. He said:

"It is common knowledge that the great difficulty to be overcome in reaching the plateau about the city was in climbing the hills, and that the instrumentality by which that was accomplished became the principal feature of any such plan. The approach to the bottom and the departure from the top

were incidental, and were certainly necessary to get passengers to the place of ascent and descent."

The inclined plane proper seems to be the most costly and vital part of such a railway, and as the controlling feature gave its name to the entire scheme, including therein as incidents the approach thereto from the city at its base and the suburbs on the hilltop. As before stated, there was no special provision in the Ohio statutes for the incorporation of inclined plane railway companies until 1876. The company whose franchises are here concerned was organized in April, 1871, under the provisions of the general corporation act of Ohio of May 1, 1852, providing for the incorporation of steam railway companies, for the purpose of constructing a railroad, the termini of which were to be in the city of Cincinnati and the village of Avondale. In February, 1889, the Avondale terminus, by proceedings in accordance with the law of Ohio, was extended to Glendale in the same county. In 1871 the said railway company constructed an inclined plane railway which extended from the base of the hill at or near Mulberry street to the top of the hill on Locust street. The length of this inclined plane was about 800 feet, within which distance it attained an elevation of about 300 feet. This inclined plane crossed three hillside streets of the city, upon abutments or piers resting in the streets, the track being so elevated as not to interfere with the use of the streets so crossed. Though in part the plane was constructed on land owned by the company in fee, yet a part thereof occupied Locust street, one of the streets of the city, and, as before mentioned, it crossed upon abutments three hillside streets of the city. Locust street was thus occupied, and the other streets crossed, under a contract between the city and the company contained in an ordinance passed June 16, 1871. That ordinance granted the right to so occupy Locust street, and to cross Miami, Baltimore, and Dorsey streets, upon certain terms and conditions, one of which was that the railroad should be so constructed "as not to obstruct the ordinary passage along the streets," and that the mode in which the work should be done should be approved and done to the satisfaction of the city's civil engineer. It was also provided that the grant should continue only for a term of 20 years, and take effect only when the company should file a written acceptance. By another ordinance, passed December 1, 1871, permission was granted to the said railway company to lay a double surface track from a point at the base of its inclined plane, at or near the head of Main street, on the north side of Mulberry street; thence south along Main street to Liberty street; thence west on Liberty street to Walnut street; thence south on Walnut street to Fifth street,—Market space; thence east on Fifth street to Market space. This grant was made upon certain terms and conditions therein stated, unnecessary to be here mentioned. except that it was provided that no motive power except horses and mules should be used on said tracks, and that the charges for transportation over said portions of the company's line should not exceed five cents for each passenger, and that it should keep for sale tickets in books of 25 for one dollar. It was also provided that, before construction of the said track should be commenced, the com-

v.76F.no.3—20

pany should obtain the consent of a majority in interest of the owners of property abutting thereon. This grant was made in pursuance of a petition theretofore filed with the board of aldermen and councilmen of the city of Cincinnati, which recited that the petitioner had been incorporated under the law of Ohio for the purpose of constructing a railroad from said city to the village of Avondale. There was no limitation expressed in the ordinance as to the term of this contract. A third ordinance, passed October 27, 1875, granted to the Cincinnati Inclined Plane Railway Company permission to use and occupy for a period of 30 years, with a double track, Locust street, commencing at the top of the inclined plane heretofore described, thence north to Mason street, and Mason street from Locust east to Auburn street, and Auburn street, with a single track, from Mason street to Vine street, and Vine street, by a double track, to the corporation line of the city of Avondale, with the privilege of using any tracks which may be laid by any other company. This ordinance was also granted upon certain terms and conditions, mentioned therein, one of which was that no motive power should be used except horses and mules, and that the grant should terminate in 30 years. By an ordinance of August 19, 1864, the city council of Cincinnati established a street-railway route, known and described as "Route No. 8." This route commenced at the corner of Main and Fifth streets; thence on Main street to Orchard street; thence on Orchard street to Sycamore street; thence on Sycamore to Liberty street; thence to Auburn street, on such streets or parts of streets as the promoter for building such street railway shall select; thence on Auburn street to the northern corporation line of the city, returning by the same track with suitable turnouts to the corner of Sycamore and Orchard; thence on Sycamore to Franklin street; thence on Franklin to Main; thence on Main to Court street; thence on Court to Walnut street; thence on Walnut to Fifth street, using the Cincinnati Street Railway track from Ninth to Fifth; thence on Fifth to the place of beginning, occupying the track of the Street Passenger Railroad Company in common with the said last-mentioned company. This route, after a competitive bidding, was awarded to Porteous B. Roberts, and by sundry mesne conveyances it came to be owned by Smith, Hill, and Doherty, who, in January, 1887, made a perpetual lease of it to the Cincinnati Inclined Plane Railway Company. This lease also contained an option to purchase, which was executed September 21, 1889, whereby this route was absolutely conveyed to the company. Route No. 8 came to be owned by the same persons who owned the inclined plane railway, about the time the inclined plane was built. It was connected at Liberty street with the road built from the foot of the incline, from Mulberry to Liberty, but instead of going west on Liberty to Walnut, continued on Main, south to Court; thence west on Court to Walnut, south to Fifth street, east to Main street, and north along Main street to Court. Before the inclined plane was built, "Route No. 8" went around the hill and came into the line covered by the grant under the ordinance of 1875, and was relied upon only as giving a right to the inclined plane company to maintain a second track upon one of the streets in Mt. Auburn, the other track being held under the

ordinance of 1875. The result of this combination between the inclined plane ownership and the ownership of route No. 8 was that the grant under the ordinance of October, 1871, has never been used so far as it embraces an easement from Main street on Liberty street to Walnut, and along Walnut to Court. In 1889, the Cincinnati Inclined Plane Railway Company, having, under proceedings heretofore mentioned, obtained authority to extend its line to Glendale, did extend its line of road from the Zoological Garden about five miles along the Carthage pike, by grants emanating from the proper county authorities, to the village of Glendale, in Hamilton county. It thus appears that, prior to March 30, 1877, this company, under the ordinances of 1871 and 1875, and through its lease of "Route No. 8," was owning and operating a through line from Fifth and Walnut streets to the corporation line. We have referred to this in order that we may have in mind the extent and duration of its street grants at the date of the passage of the act of March 30, 1877. That act was as follows:

"Section 1. Be it enacted by the general assembly of the state of Ohio, that any inclined plane railway or railroad company heretofore or that may hereafter [be] organized under the act of May 1, A. D. 1852, entitled 'An act to provide for the creation and regulation of incorporated companies in the state of Ohio,' shall have power to hold, lease, or purchase, and maintain and operate, such portion of any street railroad leading to or connected with the inclined plane as may be necessary for the convenient dispatch of its business, upon the same terms and conditions on which it holds, maintains, and operates its inclined plane; provided, that no other motive power than animals shall be used on the public highways occupied by such street railway company without the consent of the board of public works in any city having such a board, and the common council or the public authority or company having charge or owning any other highway in which such street railroad may be laid; and provided, that no inclined plane railway or railroad company shall construct any track or tracks in any street or highway without first obtaining the written consent of a majority of the property holders on the line of such proposed track or tracks, represented by the feet front of lots abutting on the street or highway along which such track or tracks are proposed to be constructed."

The contention of the complainant is that the effect of this act was to extend the terms of all the street grants the mortgagor company then held, and confer upon it a perpetual right to continuously occupy the streets upon which it then had tracks, and any others occupied by the lines of other companies which might be thereafter leased or purchased. The foundation of this argument lies in the fact that in Ohio there is no limitation upon the duration of a corporation, though the legislature may at any time amend the law under which they may be organized or repeal the same, and thereby terminate their existence. The contention is not well founded. Upon this point we find ourselves in agreement with the Ohio state court, which held that:

"The intention of this law was simply to invest inclined plane railway companies with the corporate power to acquire and operate street railroad routes leading to or connected with their inclined plane; that in the acquirement of such routes such companies stood in the same position as other persons and other street railroad companies, and that when such routes are acquired by such companies they are bound by all the provisions of the original grant by the city, and that none of the provisions of the same are abrogated by such

acquirement. 'The terms and conditions,' referred to in the act of 1877, are the terms and conditions of the act of May 1, 1852 (50 Ohio Laws, p. 274), relating to steam railways, and under which, as we have seen, the defendant was incorporated."

The argument that, because the state had imposed no limitation upon the duration of the corporate franchises of this company, therefore the term for which it held its street grants was likewise intended to be unlimited, is illogical. It loses sight of the distinction between those franchises conferred by the state and obtained by organization under the state law and those property or contractual franchises not granted by the state, and not inherent in the corporation as such, but which come from the local authority having the right to grant the right to occupy a public highway. We do not mean to intimate that the municipal or local authority is the only source from which such an easement could come in Ohio. The legislative history of the state is such, however, as to indicate that the settled public policy of the state is not to confer such easements, but to refer all such companies to the municipality upon whose streets or highways they wish to exercise the franchises conferred by the state for the requisite street easements, upon terms and conditions to be agreed upon between such companies and the local government. When, therefore, we come to construe an Ohio statute providing for the organization of either ordinary railway or street-car companies, we may well do so with the expectation that this well-settled policy has not been departed from, and that the state has stopped with the grant of the usual and necessary corporate franchises proper, by which it has been endowed with power to operate its road for tolls, when it shall have acquired from the local authority the equally essential right of occupying with its tracks the particular streets upon which it proposes to conduct its business. That the state did not undertake, in the general incorporation act of May 1, 1852, to confer upon any of the class of corporations therein provided for the power to enter upon and occupy with its tracks the public streets of any city or village, or the public highway of any township or county, before obtaining the consent of the local authority concerned, is too clear for discussion. Section 12 of that act expressly provided how such street or highway rights might be obtained, that section being in these words:

"Sec. 12. If it shall be necessary, in the location of any part of any railroad, to occupy any road, street, alley, or public way, or ground of any kind or any part thereof, it shall be competent for the municipal or other corporation or public officer or public authorities, owning or having charge thereof, and the railroad company to agree upon the manner and upon the terms and conditions upon which the same may be used or occupied; and if said parties shall be unable to agree thereon, and it shall be necessary in the judgment of the directors of such railroad company to use or occupy such road, street, alley, or other public way or ground, such company may appropriate so much of the same as may be necessary for the purpose of such road, in the same manner and upon the same terms as is provided for the appropriation of the property of individuals by the tenth section of this act."

The right of the local authority to impose terms and conditions is clearly conferred, and no such corporation can impose itself upon the public streets or highways unless it enter into an agreement

touching the occupancy of such streets, or resorts to the right of condemnation in default of an agreement. This right to impose terms and conditions most obviously implies the right to agree upon the duration of such occupancy. The right to exclude altogether, unless resort be had to condemnation, involves the right to limit the period of the grant. In Detroit Citizens' St. Ry. Co. v. City of Detroit, cited heretofore, we had occasion to construe these words "terms and conditions," and held that, where the local government has or is given power to consent to the occupation of the public streets by such corporations, upon terms and conditions to be agreed upon, the power to act was an unlimited power, and said that, unless some limitation was to be found in other provisions of law or implied from other considerations peculiar to the law of Michigan, the time for which such grant might be made was a matter wholly within the discretion of the local government, as much as any other term or condition of the grant. In that case a grant of a street easement for a term in excess of the life of the corporation was sustained, against the argument that there was an implied limitation making it requisite that the term should conform to the life of the corporation. The limitations contained in the ordinance of June 16, 1871, granting permission to occupy a part of Locust street, and to cross Miami, Baltimore, and Dorsey streets, are unquestionably valid and obligatory. The limitation upon the duration of the grant was just as much within the power of the city to impose as any other term or condition mentioned within the contract. The fact that the corporate life of the corporation accepting the grant was for a term unlimited in no way abridged its capacity to accept a street grant for a shorter term. Neither would the expiration of such a street grant determine the existence of corporate life or corporate powers. It might not be in a position to exercise the valuable and important franchises of operating a street railway, but its power to do so when it could again acquire the requisite street easement would be unaffected. The case would not be different if it had located its tracks upon private property. If it owned the property in fee, its occupancy and use for corporate purposes might be commensurate with its corporate existence. But, if it acquired a less interest than the fee, it might be ejected therefrom upon the expiration of its term, though its corporate life and power would continue to exist and become again efficient when a new location should be acquired. It follows that this company held the right to maintain and operate its inclined plane railroad just so long as it had the right to occupy the place upon which its tracks were located. As to a part of its railroad, its right of occupancy was unlimited, because it owned the fee in the property upon which its tracks were fixed. As to so much of its railroad as occupied Locust street, or any of the streets over which its track had been constructed, its right to maintain and operate its railroad over or upon public streets depended upon the duration of its grant from the city. That grant, so far as it was dependent upon the ordinance of June, 1871, has expired, and it has no legal right to continue upon those streets, unless its grant is extended as a consequence of the act of 1877. That that act does not have any such effect we are entirely satisfied.

Any inclined plane railway or railroad company theretofore organized, or which might thereafter be organized, under the act of May 1, 1852, was given power to "hold," maintain, and operate "such portion of any street railroad leading to or connected with its inclined plane, as may be necessary for the dispatch of its business," or purchase any such portion of a street railroad. If, before, its power to own, maintain, and operate such a street railway in connection with its incline under its charter powers was doubtful, its corporate powers were by this act enlarged, and that which before may have been in excess of its powers or of doubtful authority became lawful and valid. The legislature was not dealing at all with the subject of the term or duration of the street rights of such companies, but was dealing with the question of the corporate capacity of a corporation organized under the steam or commercial railway act to maintain and operate an ordinary street railway. The terms and conditions by which it might enter upon and occupy the streets of the city with its inclined plane, or as an ordinary commercial railroad, had been covered by the twelfth section of the act under which these inclined road companies had been organized. That section had referred such corporations to the local authority to obtain the requisite grant, and had authorized the latter to define the terms and conditions upon which such right of occupancy might be permitted. The terms and conditions upon which the Cincinnati Inclined Plane Railway Company held and operated its inclined plane proper, if we apply those words to its right of occupancy of the place upon which that structure stood, were not identical, for, as we have seen, it owned in fee in part, and a term of 20 years limited its occupancy as to the rest. It would be absurd, as observed by Judge Smith in delivering the opinion of the state court, to apply these words as a limitation upon its right to hold other parts of its line then owned, or which might thereafter be acquired by lease or purchase, to the terms and conditions under which it occupied Locust street and crossed the other streets named in the ordinance of June, 1871; for one of the conditions imposed by that ordinance compelled it to support its track upon abutments or piers, resting in the streets crossed. So such a construction would operate to shorten nearly every grant then owned or subsequently acquired by that company. It would be equally absurd to construe the clause of the act providing that such companies should hold such portions of the street railroads then operated by them perpetually, and without regard to the duration of the street grants under which such railroads occupied with their rails the public streets of the municipality within which they were situated. Nothing in the act indicates an intention to extend its rights of occupancy beyond the contracts under which they were held, or to alter the conditions of section 12 of the act amended. As we read the act, the provision that such companies might hold, lease, or purchase, "upon the same terms and conditions on which it holds, maintains, and operates its inclined plane," has no reference to the mere structure constituting an inclined plane, nor to the special terms and conditions upon which any such company had been permitted to occupy the streets upon which such a railroad had been placed, but refers to the general provisions

and conditions of the act of 1852, touching the strictly corporate franchises conferred by that act and the mode prescribed by section 12 thereof, by which such companies might acquire the necessary street grants for the exercise of the proper and profitable functions of a railroad company. The provision in no way enlarged the scope or duration of grants then held, and permitted all such companies to thereafter acquire by lease or purchase other portions of street railways in the manner and subject to the same restrictions prescribed by the act of 1852. We are, therefore, of opinion that this act did not extend the duration or alter the terms or conditions upon which that company then held any street grant. This disposes of the grants of June, 1871, and October, 1864. Both of those grants contained a limitation of 20 years, which has long since expired. Neither has been extended by the act of 1877, and the mortgagor company has no longer a right to maintain its tracks upon the streets covered by those grants, unless the city has estopped itself by conduct to be hereafter considered.

This brings us to a consideration of the grants embodied in the ordinances of December, 1871, and October 27, 1875. The first contains no time limitations whatever. The second was granted for a period of 30 years, commencing at date of grant. Neither of these grants has, therefore, expired by limitation. The Ohio court was of opinion that neither grant was valid, upon the ground that the city had no power to extend the tracks of an inclined plane company, organized as a steam railway, along the streets of a city to be operated as a street railroad. The opinion of the superior court of Cincinnati, adopted as the opinion of the Ohio supreme court upon this point, was as follows:

"The ordinance under which this grant was made designated it as an extension, and treats such an extension as a street railroad, which it was, in fact. But, while the city authorities are undoubtedly invested with power to extend a street-railroad route after its original establishment (sections 2501–2505, 3443, Rev. St.), it is also undoubtedly true that it only has power to extend a street railroad as a street railroad, and that it has no power to extend a steam railroad and call it a street railroad, and invest it with all the powers of a street railroad. To have a legal extension of a street railroad there must be a street railroad to extend. A steam railroad may be extended as a steam railroad, but it cannot be extended as a street railroad any more than a street railroad can be extended as a steam railroad. The extension must be of the same legal nature as that which it extends. For the same reason, we are of the opinion that the ordinance of 1875 which undertook to extend the inclined plane railway as a street railway north of the place, was also void." 30 Wkly. Law Bul. 326.

In the view we have taken of the effect of the act of 1877 invalidating the grants under which that company was occupying the streets embraced within these ordinances, it is unnecessary to determine whether those ordinances were invalid. There are considerations which tend to a contrary view. The situation of such inclined plane railway companies was peculiar. There was no specifically prescribed form under the general incorporation act under which they could organize. The motive power intended to be used was steam, so far as the operation of the inclined plane proper was concerned. None other, under the then state of the art, was suffi-

ciently powerful or reliable. To simply carry passengers from the base or top of the plateau, and leave them, was to accomplish but a small part of the difficulty which they set about to remove. The passengers must be brought to the incline and distributed, either in the city or its suburbs. Thus, though the inclined plane was the central part of the scheme, the railroad at the top and bottom of the inclined plane were necessary adjuncts of the business. The city willingly granted permission to extend its railroad at both ends of the incline, but did this only on condition that upon such extension no other power should be used than animal, and also limited its tolls for passengers. The state court seems to have been of opinion that, while the city had the power to authorize such extensions of a railroad line, either commercial or street, it could not extend one and call it another. It seems somewhat difficult to see why a change in motive power should be ultra vires. There was no condition in the Ohio corporation law that a commercial railroad should use steam, or only steam. No reason occurs why an ordinary railroad desiring to pass its cars through the streets of a city might not be required, as a condition of street occupancy, to use animal power alone, or why, as an added condition, it might not be required to carry passengers in such cases at a low rate. It is hard to draw any hard and fast line between what is called an "ordinary commercial railroad" and a "street railroad" proper, if any such line is to be drawn, neither the motive power nor the rate of tolls will answer. The only one which seems reasonable is found in the difference between the business each is intended to do. Whether there is any such constitutional difference between them as to prevent either from doing both kinds of business, under a general carrier charter, we need not now determine. If we accept the construction placed by the Ohio court upon the general and special powers of the city of Cincinnati, we are still confronted with the question of the effect of the act of 1877, in confirming or validating the defective grants theretofore made by the city and accepted by that company.

This is a question res integra. The opinion of the state court does not directly deal with this as a distinct question. It is true that that court did hold that the ordinances of 1871 and October, 1875, by which the inclined plane railroad company had been permitted to extend its railroad from the base of its incline to the heart of the city, at Walnut and Fifth streets, and from the top of the incline to the corporation line at the Zoological Garden, were invalid, on the ground heretofore stated, but the court does not consider the curative effects of the act of 1877. This question is one upon which the Ohio court has expressed no definite opinion, and if the decree is of no effect, as res adjudicata, this court is clearly at liberty to pronounce an independent judgment as to the legal effect of the act in question in validating the then existing contracts between the city and the Cincinnati Inclined Plane Railroad Company, and this independently of the ground stated in a former part of this opinion. The subject of the act was the powers of inclined railroad companies, organized under the so-called steam railroad act of 1852. The object,

from its general tenor, was to legalize, if illegal, the business they were doing as street railroad companies. The clear purpose was to remove any difficulties which stood in their way by reason of their peculiar business and their organization under the commercial railroad act. We are justified in assuming that it was known to the legislature that such companies were more nearly street railroad companies than ordinary commercial railroads, and that they were engaged in doing business peculiar to street railroads. Now, to construe this act as wholly prospective would lead to most absurd consequences. To give them power to lease or purchase portions of street railroads connecting with their inclined plane, and no authority to hold, operate, and maintain such as they already had, would be a situation so absurd as to require us to look for some more reasonable meaning. Take the company whose street franchises are involved. It had been for years operating a long line of street railway in connection with its inclined plane. To give it power to acquire by lease or purchase such a railroad, without power to hold that which it had, would be to strip it of its property rights and compel it to again lease or purchase that which was already its own. That no such curious result is to be found in this act is made clear, if we bear in mind the purpose of this act and the defects of power intended to be remedied thereby. We accordingly find that the act is not limited to a grant of power to acquire in the future such railroad, but confers power "to hold, lease, or purchase, and maintain and operate such portion of any street railroad leading to or connected with the inclined plane as may be necessary for the convenient dispatch of its business." This power to hold, maintain, and operate, if to be given any effect, must operate by way of validating the grants or contracts under which such companies then held, maintained, and operated such railroads as conform to the description mentioned.

Whatever doubt may exist as to the sufficiency of the corporate powers of the Cincinnati Inclined Plane Railway Company, prior to the act of 1877, to hold, maintain, and operate a street railroad in connection with its inclined plane, or as to the power of the city of Cincinnati to consent to the occupancy of its streets, that defect in power was removed by the act of 1877. In 1885, the city of Cincinnati, by proper ordinance, permitted this very company to use either a cable, compressed air, or electricity as a motive power in the operation of the street-car lines covered by these two grants and that known as "Route No. 8." The change was subsequently made from horse power to electricity. Its system of electricity interfered with the operation of a telephone line, whose wires were strung along the same streets. The latter undertook to enjoin the railroad from the use of the single-trolley electrical system as a motive power. The power of the company to hold, maintain, and operate a street-car line, and the power of the city to authorize it to change from horse power to electricity, was challenged by the telephone company. The superior court of Cincinnati, in an opinion found in 23 Wkly. Law Bul. 165, held that, under the act of 1877, this line of railroad from the foot of the incline down to the city, and from the top of the hill

to the suburbs, were lines connected with the incline, and were necessary incidents in getting passengers to the place of ascent and descent, and that the change from animal power to electricity was authorized by that act, the board of public works having assented. This conclusion as to the validity of the corporate power of that company to maintain and operate this street railroad with electricity was affirmed upon an appeal to the supreme court, though the judgment was reversed upon another question in the case. 23 Wkly. Law Bul. 165; 48 Ohio St. 390, 27 N. E. 890. Whether the act was passed because the corporate power of such companies did not authorize the operation of a street railroad under a steam railroad charter, or to remove a mere doubt, the result is the same. If ·the charter power was insufficient to enable such companies to maintain and operate street railroads, or to accept a street grant for such a purpose, or if the power of the city of Cincinnati was not sufficient to enable it to authorize a steam railroad company to occupy its streets with a street railroad, the clear purpose and effect of the act of 1877 was to validate that which had been done in respect to such companies. The power to "hold," maintain, and operate "portions" of such street railroads then held by such companies is as clearly granted as is the power to acquire thereafter, by lease or purchase, such parts of other lines as may be necessary for the convenient dispatch of business. Cincinnati & S. G. A. St. Ry. Co. v. Cumminsville, 14 Ohio St. 523, 538.

The suggestion that this act of 1877 was itself void, as a special act, not having uniform operation, or as a special act conferring corporate powers, both of which kinds of legislation are obnoxious to section 26, art. 2, or section 1, art. 13, of the Ohio constitution, has not seriously impressed us. The point was not made by the eminent counsel who argued the case of City & Surburban Tel. Ass'n v. Cincinnati Inclined Plane Ry. Co., 23 Wkly. Law Bul. 165, though the legal organization of the railway company and its right to maintain and operate a street railroad was bitterly controverted. Both the superior court of Cincinnati and the supreme court held that under that act the railway company was lawfully using electricity as a motive power in the operation of its railroad. Neither was any such constitutional objection raised or considered in the subsequent case of City of Cincinnati v. Cincinnati Inclined Plane Ry. Co. The act is not special in form. It applies to all inclined plane railroad companies which had been organized under the act of May 1, 1852, and operates to confirm all such companies in their ownership and operation of street railroads, so far as such maintenance and operation had been invalid by defect of power. How many companies had been so organized, or were engaged in operating street-car lines, we have no means of knowing. Whether few or many, the classification was not arbitrary, but general and natural. It is difficult to conceive that the legislative power of Ohio is so cramped as to be unable, through the form of a general statute, to.extend relief and remove doubts as to the legal organization of so useful a class of corporations as that described in this act. We are not convinced as to the unconstitutionality, and shall give the act the benefit of any doubt.

The grant under the ordinance of December, 1871, was unlimited as to time. There was at that time no statutory restriction upon the power of a city to grant an unlimited street easement to either a railroad or street-car company, having the requisite franchises from the state. The act limiting the power of a city to a term not exceeding 25 years was not passed until May 14, 1878. Neither do we think there was any implied restriction upon the power of the city, springing from reasons of public policy. The corporation to which this grant was made was perpetual, and we see no sufficient reason which would justify the court in holding that it was not within the discretion of the municipal government to grant to such a company an unlimited easement upon the streets. But only a fragment of this grant has ever been actually used,—that part of the line at the base of the inclined plane south upon Main to Liberty. The rest of the line authorized by this ordinance has never been constructed. The concurrent ownership of the grant under this ordinance and the grant under "Route 8," by the same persons, accounts for this disuse of the remainder of the line permitted by this ordinance. The route actually occupied by this company from Main and Liberty was that designated as "Route 8," namely, south on Main to Court street; west on Court to Walnut street; south on Walnut to Fifth street; east on Fifth to Main street; thence north on Main to Court street. The grant under the ordinance in question was only identical with that embraced in "Route 8" from Court on Walnut to Fifth, thence on Fifth east to Main. That part of the grant beginning at Liberty and Main, thence west on Liberty to Walnut, thence south on Walnut to Court, seems never to have been occupied by this company under any franchise. The deliberate selection of "Route 8" as a more desirable means of reaching Fifth street, and the disuse for a period of over 20 years of substantially all of the grant under this ordinance of December, 1871, must, in the absence of countervailing circumstances, be regarded as an abandonment of this grant except in so far as it has been actually used between the base of the inclined plane and Liberty street. Abandonment by nonuser of grants of this character may be the more readily presumed, the grant being of a public easement, and for the purpose of providing for and promoting the public good. Henderson v. Railway Co., 21 Fed. 358. There are no circumstances in this case tending to show that this company intended at any time to avail itself of the privileges of this grant. There are no circumstances tending to make the intention of this company by this long disuse doubtful, nor any facts which tend to prove an extension of the time within which it might have appropriated and used the right of way herein granted, such as appear in the case of Citizens' St. Ry. Co. v. City of Memphis, 53 Fed. 715. We think, however, that the occupancy and continued use of the fragment of this grant was an effective acceptance of that part of the grant from the foot of the incline at Mulberry street to the connection at Liberty street with "Route 8." Under the ordinance of October, 1875, there was granted to this company a right of way upon certain streets for a period of 30 years. This grant authorized the construction and maintenance of a double track from Locust street, commen-

cing at the top of the inclined plane proper; thence north to Mason; thence, on Mason, east to Auburn street; thence, on Auburn, by a single track, to Vine; thence, on Vine, by a double track, to the corporation line at the Zoological Garden. This grant has not expired, and the streets mentioned therein have been occupied, and a line continuously operated thereunder. A double track has been maintained on Auburn street between Mason and Vine,—one under this grant, and the other under the grant of "Route 8." The permission to maintain this second track upon Auburn street has, as we have heretofore stated, long since expired by the limitation contained in the ordinance of 1864.

It has been urged that the expenditure of the great sum of money necessary to change the motive power from horse to electricity, a change made under resolutions of the board of public works after the expiration of the grant for "Route No. 8," and the grant of June, 1871, estops the city from denying the rightful occupation of the streets by the company, and operates as an extension of the expired grants. The resolutions referred to simply consented to the substitution of electricity for animal power. The consent was not given by ordinance, and was not intended to extend any franchise. It was a consent granted under the act of March 30, 1877, which provided that no other motive power should be used upon any street railroad held, or acquired thereafter, by inclined plane railroad companies, without the consent of the board of public works in any city having such a board. The supreme court of Ohio held that the Cincinnati Inclined Plane Railroad Company was legally using electricity as a motive power; the board of public affairs, the legal successors of the board of public works, being empowered to permit such change by act of March 30, 1877. Cincinnati Inclined Plane Ry. Co. v. Telegraph Ass'n, 48 Ohio St. 420–422, 27 N. E. 890. Under the statutory law of Ohio, no street franchise of such a company could have been granted, renewed, or extended, at the date of the resolution passed by the Cincinnati board of public works, or that passed by its successor, the board of public affairs, except by an ordinance passed upon the recommendation of the board of public affairs. Rev. St. Ohio, §§ 1665, 1666, 2227, 2501, 2502, 3438, 3443. The city was but a trustee, acting for the public in respect of the granting of street easements. The mode in which it might grant such street rights was specifically prescribed by law. It was not, therefore, competent for the board of public affairs to extend such an easement without the concurrent action of the legislative branch of the government, and the mere nonaction of the municipal government after the expiration of a part of the street grants under which the company was occupying the streets neither creates an estoppel nor operates as an extension of grants which could only be extended by ordinance duly enacted. We do not undertake to say that a municipal government may not, under some circumstances, estop itself from asserting a legal right or denying a liability. Dill. Mun. Corp. §§ 459, 675. This question has been considered, and the authorities cited, by Judge Taft in City of Detroit v. Detroit City Ry. Co., 60 Fed. 161. But the facts in this case do not, in our judgment, establish an estoppel,

and are wholly insufficient to establish a legal extension of either of the expired grants.

What remedy can be afforded the complainant to protect it and its interests against the destruction of its property rights, in so far as those rights will be affected by the removal from the streets of the rails, poles, and other equipment now occupying streets covered by the grant of 1875, and that fragment occupied under the grant of December, 1871? By abandonment of the grant of December, 1871, and by expiration of the grant known as "Route No. 8," and by expiration of the grant of June, 1871, its occupation of many of the streets, from which the city threatens to eject it, is unlawful, and as to those streets complainant must submit. As to the line from the top of its inclined plane, save one track on Auburn street, its rights have not expired, and that track should not be disturbed by the city. Still, it is said that the state court adjudged the ordinances of 1875 and of December, 1871, to be void, and has decided that the city is entitled to remove the rails and other equipment occupying the streets embraced in those ordinances, and stop the operation of its railroad on said streets, and that this court, by reason of section 720, Rev. St., is powerless to prevent the execution of that decree, although this complainant has a large property interest to be affected thereby, and is not bound by that decree. When this bill was filed the state court had not enjoined the mortgagor company from operating its entire line. The issuance of any writ of injunction, or of any writ to dispossess the company, stood suspended until further order of the court. It was not, therefore, sought to enjoin the issuance or execution of any writ under the decree of the state court, nor could such an injunction have been properly allowed. Neither would it have been proper, under section 720, Rev. St., to have enjoined the city from applying for any writ which the state court might lawfully issue, or to have prevented, by injunction, the execution of such writ, although its execution might have been very destructive to the interests of this complainant. The remedy by injunction against proceedings in a state court is not permitted under the act of congress. Complainant would be driven to rely upon his legal remedy for damages against the city, its agents and attorneys, for any injury done it by the destruction of its rights as a mortgagee not bound by the judgment of the state court. Under the bill as framed, and under the facts as they then appeared, this court could only declare the legal rights of complainant, and enjoin the city from itself undertaking to dispossess the mortgagor from that part of its line occupied under valid and unexpired grants. A litigant may not execute his own decree. If the adversary will not quietly surrender the subject of litigation, resort must be had to the court in which the right was declared for the proper legal writ, and for its regular execution. It is therefore proper, under the allegations of the bill as to the purposes of the defendant, to enjoin it from taking into its own hands the enforcement of the decree of the state court.

Before this cause was finally heard below, and before any process had issued under the state court decree, the complainant herein filed another bill in the same circuit court of the United States, for the pur-

pose of foreclosing the mortgage, under which it was the trustee, a default in interest having occurred. Under the latter bill a receiver was appointed, and placed in possession of the entire railroad, and has ever since been operating the same under orders of the circuit court. That bill was pending when this case was appealed, and a copy of the record in that cause was offered as evidence in this cause, after the case had been argued, but before it was decided. This, upon objection, was ruled out, but by bill of exceptions has been included in the record before us. We see no reason why the learned district judge might not have received this record, not as evidence affecting this case, but as matter proper for consideration when he should come to consider to what extent he had the power to grant relief. Having the actual possession and custody of the property involved, that possession should not be disturbed, except upon application to the court. The mortgagor is no longer in possession, and is not engaged in the operation of the railroad whose rights are involved. The possession of the receiver is the possession of the court, and the property is in custodia legis, and held and operated for the benefit of all having an interest or right therein. If the occupation of any of the streets of Cincinnati is no longer lawful, the court should be quick in directing its receiver to respect the rights of the city, and to desist from the operation of such parts of the road as are upon streets where the easement has expired, unless the consent of the city for such further operation is first obtained. The federal court must not suffer itself to be used as a means of obstructing the just and legal rights of the city, or less prompt in courteous regard for the judgment of the state court, than the absolute necessities of the case demand, in order to prevent injustice to this complainant.

Before the federal court took possession of this property, and placed it in the possession of a receiver, the city might have applied to the state court for all proper writs. It could not properly be restrained from making such application, nor would the federal court have restrained the execution of any writ so issued. The case is now different. The federal court has first obtained possession, and any application to dispossess the receiver should be made to the court appointing him. In this way, and in this way only, can unseemly conflicts of jurisdiction between courts co-ordinate in power and authority be avoided. This case and the foreclosure suit were pending in the same court. We see no difficulty in the circuit court taking judicial notice of the pendency of another suit in the same court under which it had taken possession of the subject-matter of this suit. With such judicial cognizance, the question of remedy is clear. The court might have directed the filing of an amended and supplemental bill in this case, setting up the pendency of the other suit, and the action had therein, or ordered this to be filed as a petition in the other cause, with leave to bring the city of Cincinnati in as a party claiming rights in the mortgaged property. That this or such other course may be taken as the complainant may be advised, the decree will be reversed and remanded, with leave to amend in the manner suggested, and for such further orders and decrees not inconsistent with the views here expressed.