CITY OF CHATTANOOGA *v.* TENNESSEE ELECTRIC POWER CO.

*(Nashville,* December Term, 1937.)

Opinion filed Jan. 18, 1938.

Will F. Chamlee and Phil B. Whitaker, both of Chattanooga (Whitaker & Whitaker, J. W. Anderson, Frank Chamlee, and Wm. W. Haynes, all of Chattanooga, of counsel), for City of Chattanooga.

L. N. Spears, Frank Spurlock, and T. Pope Shepherd, all of Chattanooga (Brown & Spurlock, Shepherd, Curry & Levine, and W. D. Spears, all of Chattanooga, of counsel), for Tennessee Electric Power Co.

Mr. Justice DeHaven delivered the opinion of the Court.

This is a suit brought by complainant, City of Chattanooga, against the defendant, Tennessee Electric Power Company, under the Declaratory Judgments Law, Code 1932, section 8835 *et seq.*, seeking a decree declaring (1) the rights, if any, of the defendant to occupy the streets, alleys, sidewalks, and public places in the City of Chattanooga for the purpose of furnishing and distributing electric light and power to the citizens thereof, and (2) the right of complainant to terminate, upon reasonable notice, the rights granted to the defendant by certain ordinances of the city.

It appears from the record that on the 5th day of December, 1881, the Brush Electric Light Company of Chattanooga was granted a charter of incorporation by the State of Tennessee. The general purposes of the corporation, as set forth in the charter, were, among others, "to produce, sell, rent, supply or furnish light, heat or motive power for use by the inhabitants of said County of Hamilton or any corporation, city or village therein, and to secure the necessary rights and franchises to carry out the purposes aforesaid." On January 17, 1882, the Mayor and Aldermen of the City of Chattanooga passed Ordinance 390, providing by section 1 thereof:

"That the right, privilege and franchise is hereby given and granted to the Brush Electric Company of Chattanooga to erect poles and place wires and all other proper and necessary appliances and apparatus thereon, in and upon the streets, sidewalks and public alleys within the corporate limits of said corporation necessary and required for the purpose of erecting, constructing and conducting an electric light company in said city."

By section 2 of the ordinance it was provided: "Said

company may place their poles in and along the streets, sidewalks and alleys of the city; but they shall be located therein under the direction and supervision of the City Engineer and in such places and such manner as to cause the least possible obstruction in said streets, sidewalks and public alleys consistent with the purposes of said company." It was further provided, "and said company shall be responsible for any and all damages that may be adjudged against the said Mayor and Aldermen by reason of the erection, establishment, construction and maintenance of said poles, wires and apparatus, or arising in any way therefrom. And the acceptance by said company of the rights herein granted shall be taken as an acceptance of the conditions herein set out." Section 3 of the ordinance provided that the company after erecting poles, wires, and apparatus should replace the streets in as good condition as before the work was done. Section 4 provided that in opening or changing streets the company, upon notice to the city, should have all the expenses of the removal or change of its poles and wires. Section 5 was as follows:

"Nothing herein shall be construed to grant an exclusive privilege to said company or in any manner to interfere with the rights and privileges heretofore granted to other persons or companies."

On the 28th day of July, 1887, the Hauss Electric Light & Power Company was granted a charter of incorporation by the State of Tennessee for the purpose of "manufacturing electricity for lighting and motive power and for its distribution." On August 16, 1887, the Mayor and Aldermen of the City of Chattanooga passed Ordinance 695 granting permission to the Hauss Electric Light & Power Company, its successors and as-

signs, "to place, maintain and use poles and wires in and over the streets, alleys, lanes, squares and public places of the city, including sidewalks, for the purpose of conducting electricity for furnishing light and power, and to erect all the necessary fixtures therefor, including posts, pins and abutments necessary for the wires." And, "That the city has the right, when it is deemed necessary or expedient, to stretch its electric fire alarm wires upon any of the poles of the said Hauss Electric Lighting & Power Company." The ordinance is substantially the same as Ordinance 390, with the exception of the provision with respect to the city's fire alarm wires, and it contains no provision that it shall not be construed to grant an exclusive franchise.

It appears that both the Brush Electric Light Company and the Hauss Light & Power Company were granted permission by the City of Chattanooga to exercise the powers conferred upon them by charters within the corporate limits of the city, for an unlimited time, subject to the conditions set forth in the respective ordinances giving consent to their entry.

In June, 1888, the Brush Electric Light Company and the Hauss Electric Light & Power Company were consolidated and all their rights transferred to a new corporation known as the Chattanooga Electric Light Company, and a charter for said company was issued by the State of Tennessee in June, 1888.

The charter of the Chattanooga Electric Light Company set forth that its general purpose, in substance, was the manufacture of electric power and the distribution of the same, "within the State of Tennessee and particularly within the City of Chattanooga." It was provided in the charter, among other things: "And

further all the powers and privileges contained in the charter of the Brush Electric Light Co. and the Hauss Electric Lighting & Power Co. of Chattanooga, Tennessee.''

The Chattanooga Electric Company transferred its properties and rights to the Chattanooga Electric Light & Power Company, and this company operated the system in the City of Chattanooga until 1895, when its properties, franchises, and privileges were sold in a proceeding in the Circuit Court of the United States for the Eastern District of Tennessee to H. C. Lewis, trustee. Shortly before this sale, the Chattanooga Light & Power Company was granted a charter by the State of Tennessee conferring the authority to manufacture, distribute, and sell electricity for light and power purposes. Thereafter, in March, 1895, H. C. Lewis, trustee, transferred and conveyed to the Chattanooga Light & Power Company, its successors and assigns, all the properties acquired by him at the sale above mentioned. Subsequently, the Chattanooga Light & Power Company transferred the properties to the Chattanooga Electric Company, a corporation of the State of New Jersey.

On January 4, 1904, the General Council of the City of Chattanooga passed a resolution giving its consent, on behalf of the municipality, ''to the acquisition by the Chattanooga Electric Company, . . . by purchase of the franchise and properties of every description belonging to the Chattanooga Light & Power Company, and consent is hereby given to the Chattanooga Light & Power Company to sell its rights and franchises, . . . to the said Chattanooga Electric Company, and:

''That the rights and franchises now owned and held by the Chattanooga Light & Power Company and grant-

ed to it by the City are to be held, owned and used by the Chattanooga Electric Company, subject to the terms, conditions and limitations imposed when granted or since imposed by any ordinance of the City, and this resolution is in no wise to affect the contract now existing between the City and the Chattanooga Light & Power Company."

The Chattanooga Electric Company (of New Jersey) sold and transferred its franchise and properties to the Chattanooga Electric Company, a corporation of the State of Maine. This sale and transfer was consented to by the General Council of the City of Chattanooga, on July 20, 1908, by resolution of the same tenor as the resolution just above set out.

The Chattanooga Electric Company transferred its franchises and properties to the Chattanooga Railway & Light Company, chartered under the laws of the State of Tennessee, and by that company transferred to the Chattanooga Railway Company, and by that company transferred to the Tennessee Power Company, and by that company transferred to the defendant, Tennessee Electric Power Company, in 1922. At the time each transfer of such rights and properties were made, the City of Chattanooga, through its governing authority, passed an ordinance consenting to the sale by the old company and the acquisition by the new, and in each instance it was resolved, in effect, that the rights and franchises then owned and held by the operating company are to be held and owned by the new company.

It further appears that in January, 1909, the quarterly county court of Hamilton county passed a resolution granting to the Chattanooga Electric Company, its successors and assigns, permission to place and maintain

poles and wires in and over the streets and alleys "in the suburbs of Chattanooga," for the purpose of transmitting and distributing electricity and selling the same throughout said territory. It was further provided: "That nothing herein shall be construed to grant an exclusive privilege to said company or in any manner to interfere with the rights and privileges heretofore granted to other persons or companies." Other resolutions, granting the right of extension of service to described territory within Hamilton County, were granted by the court.

Defendant says in its answer, in substance, that it has a right to use the streets of the city by reason of the charters obtained from the State of Tennessee, and that any ordinance of the city, or resolution of the quarterly county court, was nothing more than the consent of the city and county to the exercise of the franchise powers granted to it by the State of Tennessee in the various charters its predecessors had obtained. Defendant also relies on the doctrine of equitable estoppel as a defense.

The chancellor decreed that the city ordinances and the resolutions of the quarterly county court of Hamilton county, by virtue of which defendant is now occupying the streets of the City of Chattanooga, being without limit as to time, vest in the defendant a property right which may not be impaired, and that the franchise is not revocable upon reasonable notice and does not violate the constitutional prohibition against perpetuities. The chancellor further held that the source of defendant's right to occupy the streets of the city was Ordinances 390 and 695, and the resolutions of the quarterly county court of Hamilton county, and not under the charter provisions.

From a decree in accordance with the above findings, complainant has appealed to this court and assigned errors.

The questions made by the assignments of error may, for convenience, be grouped as follows:

1. It is contended that under the charter of 1887 of the City of Chattanooga it had neither the express nor implied authority to grant a franchise right to the Brush Electric Light Company, or to the Hauss Electric Light & Power Company, to occupy the streets of the city in perpetuity.

■ ■ It is well settled that a municipal corporation can exercise only such powers as are expressly granted in its charter or arise by necessary implication in order to carry out the declared objects and governmental purposes for which the corporation was created. *Mayor, etc., of Bristol* v. *Dixon,* 55 Tenn. (8 Heisk.), 864; *Memphis Street Railway Co.* v. *Haynes,* 112 Tenn., 712, 81 S. W., 374. The control of streets and highways rests primarily in the state, and such control and powers as a municipality may have over the streets must be delegated to it by proper legislative authority. *Humes* v. *Mayor of Knoxville,* 20 Tenn. (1 Humph.), 403, 34 Am. Dec., 657; *Mayor, etc., of Nashville* v. *Brown,* 56 Tenn. (9 Heisk.), 1, 24 Am. Rep., 289.

When Ordinances 390 and 695 were passed, the City of Chattanooga was operating under a charter granted in 1869, by the terms of which the city was authorized to "open, alter, widen, extend, establish, grade, or otherwise improve, clean and keep in repair streets, alleys and sidewalks, and to have the same done," and "to pass all ordinances not contrary to the constitution and laws of the state that may be necessary to carry out

the full intent and meaning of this Act and to accomplish the purposes of their incorporation.''

While the charter did not in express terms delegate to the city general control over its streets and alleys, the powers in reference thereto were so numerous and sweeping as to be the equivalent of general control. This seems to be conceded by counsel for the city, for they say in their brief: ''The charter of the City of Chattanooga, enacted in 1869, gave the city general control and supervision of its streets.''

In the case of *American Car & Foundry Co.* v. *Johnson County*, 147 Ky., 69, 71, 143 S. W., 773, 774, quoted with approval by the Supreme Court of the United States in *Owensboro* v. *Cumberland Teleph. & Teleg. Co.*, 230 U. S., 58, 67, 33 S. Ct., 988, 991, 57 L. Ed., 1389, 1394, it appears that the county fiscal courts were given, by statute, ''general charge and supervision of the public roads,'' etc. Ky. St., section 4306. Concerning the power resulting from the grant by the state to control streets or public highways, the court said:

''The right to grant a franchise presupposes and is based upon the right of the authority granting the franchise to control the property over which the franchise is granted, or which is affected by it. For example, the fiscal court could grant a franchise authorizing the erection of poles along the highways of the county, as the fiscal court has control of the highways. And so municipal corporations may grant franchises to use the streets and public ways of a city.''

In *Humes* v. *Mayor of Knoxville*, 20 Tenn. (1 Humph.), 403, 34 Am. Dec., 657, it was held that a municipal corporation is the proprietor of the public streets, which are held in trust for the convenience of

the citizens, and as such proprietor may grade and otherwise improve them. In *Mayor, etc., of Nashville* v. *Brown,* 56 Tenn. (9 Heisk.), 1, 6, 24 Am. Rep., 289, the above holding was approved. Under its charter, the City of Chattanooga had the general control and supervision of its streets, in trust, for the convenience of its citizens. By Ordinances 360 and 695, the city consented to the use of its streets, by the two electric power companies named therein, for the purpose of erecting poles and wires for the transmission and distribution of electric current, under the supervision of the city engineer. Electricity for lighting the homes of the inhabitants of the city, and for power with which to operate its industries, was a pure necessity. The poles and wires must follow the streets in order to serve the purpose for which they were designed. The city was authorized by its charter "to pass all ordinances not contrary to the constitution and laws of the state that may be necessary to carry out the full intent and meaning of this Act and to accomplish the purposes of their incorporation." The two ordinances in question were in no way contrary to the Constitution and laws of the state and made possible the establishment of a utility essential to the development of a city. In *East Tennessee University* v. *Knoxville,* 65 Tenn. (6 Baxt.), 166, 171, it was said:

"It is the settled law that the powers of corporation of all kinds are to be strictly construed; but this strict construction has never confined the construction of the power to its word and letter, but every thing necessary and proper for carrying into execution the granted power, has always been conceded by the strictest constructionists."

We are satisfied that the City of Chattanooga had the implied power and authority, under its charter, to

enact the ordinances in question, and that the same are valid.

2. It is next contended that the chancellor erred in holding that the ordinances of the City of Chattanooga and the resolutions of the quarterly county court, being silent as to the life of the franchises granted and under the provisions of which the defendant is now occupying the streets of the city, vest in the defendant a property right which cannot be impaired, and in failing and refusing to declare that the privilege granted thereby could be terminated by either party upon reasonable notice.

When the franchises were granted, neither the charter of the city nor any general law of the state restricted in duration the life of franchise grants. The city consented to the two corporations named in the respective ordinances exercising their corporate powers within the city. This consent was not limited to any period of time. The corporate existence of the two companies was unlimited in duration, subject only to the reserved right of revocation of the charter by the state.

In 12 R. C. L., 213, 214, it is stated:

"The grant of a franchise to a public utility company is, according to the weight of authority, a grant of a property right in perpetuity, unless limited in duration by the grant itself, or as a consequence of some limitation imposed by the general law of the state, or by the corporate powers of the municipality making the grant. If there be authority to make the grant, and it contains no limitation or qualification as to duration, the plainest principles of justice and right demand that it shall not be cut down, in the absence of some controlling principle of public policy. This conclusion finds support from a consideration of the public and permanent character of

the business utility companies conduct, and the large investment which is generally contemplated.''

In *Mayor, etc., of Knoxville* v. *Africa*, 77 F., 501, 507, the United States Circuit Court of Appeals for the Sixth Circuit, speaking through LURTON, J., said, *inter alia*:

''Under the well-settled law of Tennessee the power to grant to a public corporation a right of way for the operation of public railroads, commercial or street, on or over a particular street or public highway, resides primarily in the legislature of the state, but may be delegated to municipal governments. [*Tennessee & A.*] *Railroad Co.* v. *Adams*, 40 Tenn. (3 Head), 596, 598; [*Iron Mountain*] *Railroad Co.* v. *Bingham*, 87 Tenn., 522, 11 S. W., 705 [4 L. R. A., 622]; Dill. Mun. Corp., sections 519-521. The restrictions imposed by the amendments to the constitution adopted in 1870, whereby the legislature is required to provide for the organization of corporations by general law only, would perhaps prevent the granting of a particular right of way to a particular corporation, as was done in the charter construed in [*Tennessee & A.*] *Railroad Co.* v. *Adams*, 40 Tenn. (3 Head), 596, 598. A right of way upon a public street, whether granted by act of the legislature, or ordinance of city council, or in any other valid mode, is an easement, and as such is a property right, capable of assignment, sale, and mortgage, and entitled to all the constitutional protection afforded other property rights and contracts. *City of Detroit* v. *Detroit Citizens' St. Ry. Co.*, 22 U. S. App., 570, 12 C. C. A., 365, and 64 F., 628; *Louisville Trust & Banking Co.* v. *City of Cincinnati* (decided at present term), 76 F., 296.''

Further along in its opinion the court said:

''As we have already seen, the power to grant a right of way upon the public streets resides primarily in the

legislature of the state. This power may be, and is, by the provisions of this street-railroad law, delegated to the municipal government of the city in which the proposed railroad is to be operated. This delegated authority is a trust, to be exercised for the public benefit by ordinance duly passed, and subject to the limitations and for the purposes intended by the statute. What is the extent of the power intrusted to the city government? The answer is plain. It is to 'consent' to the occupation of such of the streets of the city, between the termini named in the charter, and within the general route designated therein, as shall be deemed in the interest of the public. The 'consent,' when given by ordinance duly passed, constitutes a grant of a right of way on and over the streets named or described in the ordinance, and constitutes a contractual ordinance, conferring an easement which is irrevocable. By such an ordinance an incorporeal hereditament is created and vested in the grantee. Until 'consent' has been given by ordinance, prescribing the terms upon which the streets desired may be occupied, no street right exists in the railroad corporation. It is a corporation endowed with the substantial corporate franchise essential to the operation of a street railroad, but it is unable to exercise this franchise because it has no right to enter upon the streets and there construct the necessary tracks and other appliances needful to the maintenance and operation of a street railroad. The power to 'consent,' and the power to prescribe the 'terms' upon which it will consent, implies the power to refuse to consent, or to consent only upon terms and conditions deemed wise, including the right to impose such limitation upon the duration of the grant as shall seem proper to the legislative discretion.

*City of Detroit* v. *Detroit Citizens' St. Ry. Co.,* 22 U. S. App., 570-599, 12 C. C. A., 365, and 64 F., 628; *Louisville Trust & Banking Co.* v. *City of Cincinnati* (decided at present term), 76 F., 296.''

A leading case on this subject is *Louisville* v. *Cumberland Teleph. & Teleg. Co.,* 224 U. S., 649, 32 S. Ct., 572, 576, 56 L. Ed., 934, wherein it appears that the telephone company was operating in the City of Louisville under a franchise granted to its predecessors, which authorized the use of the streets of the city for the purpose of operating telephone lines thereon, and which was without limit as to duration. The contention was made that the original grant of street rights, having been indefinite as to time, was either void *ab initio,* or revocable at the will of the general council, or that it expired in 1893 when Louisville was made a city of the first class, with new and enlarged power. In the course of the opinion the court said:

''In considering the duration of such a franchise it is necessary to consider that a telephone system cannot be operated without the use of poles, conduits, wires, and fixtures. These structures are permanent in their nature and require a large investment for their erection and construction. To say that the right to maintain these appliances was only a license, which could be revoked at will, would operate to nullify the charter itself, and thus defeat the state's purpose to secure a telephone system for public use. For, manifestly, no one would have been willing to incur the heavy expense of installing these necessary and costly fixtures if they were removable at will of the city, and the utility and value of the entire plant be thereby destroyed. Such a construction of the charter cannot be supported, either from a practical or technical standpoint.

"This grant was not at will, nor for years, nor for life of the city. Neither was it made terminable upon the happening of a future event; but it was a necessary and integral part of the other franchises conferred upon the company, all of which were perpetual, and none of which could be exercised without this essential right to use the streets."

In *Owensboro* v. *Cumberland Teleph. & Teleg. Co.,* 230 U. S., 58, 33 S. Ct., 988, 990, 57 L. Ed., 1389, it was held that an ordinance granting the right to place and maintain upon the streets of a city poles and wires of a telephone company is the granting of a property right, as "has been too many times decided by this court to need more than a reference to some of the later cases. [In support of the statement the court cited *Detroit* v. *Detroit Citizens' Street R. Co.,* 184 U. S., 368, 395, 22 S. Ct., 410, 46 L. Ed., 592, 610; *Louisville* v. *Cumberland Teleph. & Teleg. Co.,* 224 U. S., 649, 661, 32 S. Ct., 572, 56 L. Ed., 934, 939; *Boise Artesian Hot & Cold Water Co.* v. *Boise City,* opinion just handed down (230 U. S., 84, 33 S. Ct., 997, 57 L. Ed., 1400.)] As a property right it was assignable, taxable, and alienable. Generally it is an asset of great value to such utility companies, and a principal basis for credit." The court then proceeded to say:

"The grant by ordinance to an incorporated telephone company, its successors and assigns, of the right to occupy the streets and alleys of a city with its poles and wires for the necessary conduct of a public telephone business, is a grant of a property right in perpetuity, unless limited in duration by the grant itself, or as a consequence of some limitation imposed by the general law of the state, or by the corporate powers of the city mak-

ing the grant. [Citing numerous authorities]. If there be authority to make the grant, and it contains no limitation or qualification as to duration, the plainest principles of justice and right demand that it shall not be cut down, in the absence of some controlling principle of public policy.''

In *Northern Ohio Traction & Light Co.* v. *Ohio ex rel. Pontius,* 245 U. S., 574, 38 S. Ct., 196, 62 L. Ed., 481, L. R. A., 1918E, 865, it was held that the grant by a county board of a right to construct and operate an interurban electric railway along a state highway, without specifying any limit of time, is—unless there are controlling provisions in the state constitution or statute, or a prior adjudication by its courts to the contrary—when accepted, a perpetual franchise protected by article 1, section 10, of the Constitution of the United States, against revocation by subsequent resolution of such board.

In *Ohio Public Service Co.* v. *Ohio ex rel. Fritz,* 274 U. S., 12, 14, 47 S. Ct., 480, 71 L. Ed., 898, it was attempted to oust the plaintiff in error from use of the streets in the village of Orrville. By ordinance of February 1, 1892, it was ordained that these individuals named, their successors and assigns, ''are hereby authorized and empowered to use the streets, lanes, alleys, and avenues of the village of Orrville for the purpose of erecting, maintaining, and operating electric light wire mains and apparatus complete for the distribution of electricity for light, heat, and power,'' etc. The court said:

''In *Northern Ohio Traction & Light Co.* v. *Ohio,* 245 U. S., 574, 38 S. Ct., 196, 62 L. Ed., 481, L. R. A., 1918E, 865, we pointed out the state of the law in Ohio during 1892. It is plain enough from what was there said that in our view the franchise originally granted by the vil-

lage of Orrville was for an unlimited time and not subject to termination at the mere will of the grantor.''

In support of the city's contention that the grants made by the two ordinances here in question, being for an unlimited time, are determinable by either party upon reasonable notice, cases are cited from several of the states. Some of these cases are distinguishable on their facts from the cause at bar. Without undertaking to discuss the cases cited, suffice it to say that we adhere to the rule recognized by the Supreme Court of the United States, as shown in the cases heretofore cited herein.

 3. It is next contended by the complainant that it was without power to grant the use of its streets ''in perpetuity.'' Article 1, section 22, of the Constitution of the State of Tennessee is invoked, which is as follows:

''That perpetuities and monopolies are contrary to the genius of a free state, and shall not be allowed.''

In *Eager* v. *McCoy,* 143 Tenn., 693, 703, 228 S. W., 709, 711, the court said:

''Although the Constitution of Tennessee (article 1, section 22) declares that perpetuities are contrary to the genius of a free state and shall not be allowed, the Constitution does not define perpetuities, and we must look to the common law for the proper meaning of the term. *Franklin* v. *Armfield,* 34 Tenn. (2 Sneed), 305, 306, *supra.*

''It is well settled at common law that the rule against perpetuities is not offended if an estate begins within the limits of the rule, regardless of the time at which such estate may end.

'' 'An interest is not obnoxious to the rule against perpetuities if it begins within lives in being and 21 years, although it may end beyond them. If it were otherwise,

all fee-simple estates would be bad. The law is the same with lesser estates.' Gray on the Rule against Perpetuities, section 232." ·

The remoteness against which the rule is directed is remoteness in the commencement or first taking effect of limitations, and not in the determination of them. Lewis on Perpetuities.

■ The right to use the streets of the City of Chattanooga, granted by the two ordinances, vested in the two named companies immediately on acceptance by them. The rule against .perpetuities has no application whatever to the facts of this cause. The grants were no more perpetuities than were the charters granted the two companies.

■ 4. It is next contended by complainant that the charter of the City of Chattanooga gave the city ·"the power to rescind, modify, or repeal any ordinance, or regulation." Hence, it is argued that the Brush Electric Light Company and the Hauss Electric Light & Power Company held the grants under Ordinances 390 and 695, subject to the right of the city to rescind, modify, or repeal the ordinances.

In *Louisville* v. *Cumberland Teleph. & Teleg. Co., supra,* the court said, *inter alia*:

"The right to conduct a telephone exchange and to use the streets of the city of Louisville, which had been vested by law in the Cumberland Telephone & Telegraph Company, could not be impaired or forfeited by an ordinance of the general council," etc.

In *Owensboro* v. *Cumberland Teleph. & Teleg. Co., supra,* in referring to a repealing ordinance, the court said:

"It is a plain attempt to destroy the vested property

right under which a great plant had been installed and operated for more than twenty-five years. When that grant was accepted and acted upon by the grantee it became. a contract between the city and the telephone company, which could not be revoked or repealed, unless the power to repeal was clearly and unmistakably reserved.''

5. It is next contended by the complainant that in no event could it grant a franchise for a longer period than its corporate life. By the terms of its charter, granted in 1869, it was given succession for 99 years, and hence it is argued that the most that can be claimed under the grants is to the end of the 99 years.

It appears from the brief of counsel for complainant that the charter of the city was not amended with respect to the 99-year limitation on the life of the corporation until after the passage of the two ordinances here in question. We understand from this statement that the limitation has been removed and that the corporate life of the city will endure indefinitely, subject to the right of the legislature to revoke its charter.

The fact that the City of Chattanooga had a limited corporate life at the time of the passage of the two ordinances can have no effect whatever on the right of defendant to occupy the streets of the city under the ordinances. The corporate franchises of the Brush Electric Light Company and that of the Hauss Electric Light & Power Company were granted by the State of Tennessee. However, before the two companies could legally occupy the streets of the City of Chattanooga, the consent of the city was necessary. The charter of the Brush Electric Light Company granted it the power to furnish light and power to the inhabitants of the ''Coun-

ty of Hamilton or any corporation, city or village therein, and to secure the necessary rights and franchises to carry out the purposes aforesaid.'' The City of Chattanooga could have refused the two companies entry upon its streets. The right of consent implies the right of refusal. But, having consented, such consent was irrevocable.

In *Ghee* v. *Northern Union Gas Co.*, 158 N. Y., 510, 53 N. E., 692, 693, referring to the legal effect of the consent of the municipal authorities under a statute empowering the corporation to lay gas conduits in streets, on such consent, the court said:

''It operates to create a franchise, by which is vested in the corporation receiving it a perpetual and indefeasible interest in the land constituting the streets of a municipality. It is true that the franchise comes from the state, but the act of the local authorities, who represent the state by its permission and for that purpose, constitutes the act upon which the law operates to create the franchise.''

The above was quoted with approval by the Supreme Court of the United States in *New York Electric Lines Co.* v. *Empire City Subway Co.*, 235 U. S., 179, 35 S. Ct., 72, 59 L. Ed., 184.

In *Louisville* v. *Cumberland Teleph. & Teleg. Co., supra,* it was held that the charter became ''fully operative'' when the city's consent was obtained. The court said: ''Such a street franchise has been called by various names,—an incorporeal hereditament, an interest in land, an easement, a right of way,—but, howsoever designated, it is property.'' .

▮ The consent granted by the two ordinances, for the occupancy of its streets, was only necessary to the

entry upon them. The control of streets and highways resting primarily in the state, it was immaterial to the grantees of the franchises that the delegated power of the city over the streets would expire at the end of 99 years.

After a careful consideration of the questions raised in the cause, we find no error in the decree of the chancellor, and the same is affirmed. Complainant will pay the costs of the appeal.