**PUBLIC SERVICE COMPANY OF OKLAHOMA and Town of Fort Cobb, Oklahoma, Plaintiffs in Error,**

v.

**The CADDO ELECTRIC COOPERATIVE, a corporation, Defendant in Error.**

**No. 43769.**

Supreme Court of Oklahoma.

Dec. 1, 1970.

As Corrected Jan. 18, 1971.

Rehearing Denied Jan. 20, 1971.

Robert L. Lawrence, Everett L. Cunningham, Tulsa, Carl H. Smith, Carnegie, Fowler, Rucks, Baker, Jopling, Gramlich & Mee, by R. C. Jopling, Jr. and Phillip D. Hart, Oklahoma City, for plaintiffs in error.

H. Duane Stratton, Rainey, Flynn, Welch, Wallace, Ross & Cooper, by Gordon F. Rainey, Oklahoma City, amici curiae.

Pain & Garland, Anadarko, for defendant in error.

J. A. Rinehart, El Reno, amicus curiae.

JACKSON, Justice.

The constitutionality of the Extension of Electric Service Act of 1961, 17 O.S.1961, Sections 158.1–158.6, inclusive, is under attack in this case upon the grounds hereinafter stated and discussed.

Section 158.1 of the Act provides: ·

"No supplier of electric service shall extend or render or offer to extend or render electric service to premises (a) already receiving such service from another supplier of electric service, or (b) not receiving such service and to which premises such service is available from the facilities of another supplier of electric service through an extension not more than 500 feet in length from a distribution line unless, in either case, the other supplier of electric service consents thereto in writing or the District Court of the county in which the affected premises are located, after notice to the interested parties and hearing, finds and determines that the service rendered or to be rendered by such other supplier of electric service is inadequate and will not likely be made adequate."

The provisions of the Act are made applicable only to areas outside the corporate limits of cities and towns. Section 158.3. Supplier of electric service means any person, firm, corporation, association or cooperative corporation engaged in the distribution and sale of electric service. Distribution line means a line normally constructed and operated at a voltage of not to exceed 15,000 volts. Section 158.4. District Courts are given the power and jurisdiction to enforce compliance with the Act by suppliers of electric service. Section 158.6.

The plaintiff in this case, The Caddo Electric Cooperative, a rural electric cooperative, brought this action on August 9, 1968, to enjoin Public Service Company of Oklahoma, a public service company, from supplying electricity for pumping water at a well belonging to the Town of Fort Cobb, Oklahoma, located approximately 2½ miles north of the Town of Fort Cobb.

Fort Cobb intervened in support of Public Service Company.

The facts show that Caddo Electric Cooperative had maintained an electric distribution line across the road, and less than 500 feet, from Fort Cobb's new water well location for more than eight years. This line could have been made adequate to supply electricity for pumping this well at a cost of $750.00. At an estimated cost of $3500.00 Public Service Company constructed an electric line 1¼ miles to the well site from its nearest line, the last mile of which ran parallel to Caddo's existing line on the opposite side of the road.

Public Service Company did not comply with the provisions of 17 O.S.1961, Sec. 158.1, but completed its construction in December, 1968, after this action had been filed, and has furnished electric service to the well site since April 17, 1969.

The trial court after hearing entered judgment perpetually enjoining defendant, Public Service Company, from providing service to the water well site (conditioned upon a showing that Caddo Electric can provide adequate service) and defendant and intervenor have appealed.

Public Service Company contends that the 500-foot law (Extension of Electric Service Act of 1961) impairs the obligation of the franchise contract between the Town of Fort Cobb and Public Service Company in violation of Article 2, Section 15, Oklahoma Constitution, and Article 1, Section 10, Constitution of the United States.

It is fundamental that a reasonable exercise of the police power of a state cannot be contracted away by contracting parties. 16 Am.Jur., Constitutional Law, §§ 298 and 299; State ex rel. Roth v. Waterfield, 167 Okl. 209, 29 P.2d 24; East Central Electric Cooperative v. Public Service Company of Okl., Okl., 463 P.2d 980; and Noble State Bank v. Haskell, 22 Okl. 48, 97 P. 590.

The twenty-five year contract between Fort Cobb and Public Service Company ·

was entered into in 1949, and was in effect at all material times herein. However, neither Public Service nor Fort Cobb identifies any particular obligation of the franchise which they allege is impaired. Section 2 of the Ordinance granting the franchise provides that Public Service will maintain efficient electric service "in" the Town of Fort Cobb. In Section 3 of the Ordinance Public Service agrees to pay Fort Cobb a sum equal to 2% of its gross sales of electric energy delivered within the corporate limits of Fort Cobb, other than sales of electric energy sold to Fort Cobb. That paragraph further provides that Public Service may withhold so much of the 2% as may be necessary to pay the bills for electric energy sold to Fort Cobb for its street lighting, water pumping, and municipal services of all kinds and classes. We do not find from our examination of the franchise contract that Fort Cobb is under any obligation to purchase electric energy from Public Service Company to operate its water pump located 2½ miles outside of its corporate limits. Nor do we find any provision in the franchise contract requiring or authorizing Public Service Company to supply electric energy to Fort Cobb at points beyond its corporate limits.

■ The constitutional guaranty against the impairment of contracts refers to contracts that are complete and clearly proved. 16 Am.Jur.2d, Constitutional Law, § 439.

It is next argued that the 500-foot law creates perpetual franchises in violation of Article 2, Section 32, Oklahoma Constitution. That section provides:

"Perpetuities and monopolies are contrary to the genius of a free government, and shall never be allowed, nor shall the law of primogeniture or entailments ever be in force in this State."

The argument is that if the 500-foot law is enforced, suppliers of electric service in rural areas have a right in perpetuity to serve any premises they have undertaken to serve. This result (perpetuity) is foreclosed by Art. 9, Sec. 47, Okla.Constitution,

wherein the Legislature is authorized to alter, amend, annul, revoke, or repeal any corporation charter or franchise whenever in its opinion it may be injurious to the citizens of this State. Art. 9, Sec. 47, Constitution, is automatically a part of the charters of Caddo Electric and Public Service Company, Pioneer Telephone and Telegraph Co. v. State, 38 Okl. 554, 134 P. 398; Noble State Bank v. Haskell, 22 Okl. 48, 97 P. 590, and necessarily places a conditional time limit upon their charter powers and their permits to use the highways of this State as authorized by 18 O.S.1961, Sec. 437.2(k), and 69 O.S.1961, Secs. 4 and 57.

■ Public Service Company relies upon the language used in City of Okmulgee v. Okmulgee Gas Co. (1930), 140 Okl. 88, 282 P. 640, 651, wherein we said:

"Any act of the Legislature which provides for issuing a license, revocable permit, indeterminate permit, or other instrument in the nature of a franchise, which is not limited as to its time of existence, violates section 32 of article 2 of our Constitution."

The quoted language was written in connection with a statutory procedure enacted in 1925 authorizing public service companies engaged in furnishing power, light, heat, gas, or electricity, to exchange their municipally granted franchises for Corporation Commission permits, revocable under the Act whenever in the opinion of the Legislature the permit may be injurious to the citizens of this State. The quoted language and the conclusion stated was unnecessary to a decision in that case for the reason that the statute invaded the constitutional authority of the qualified electors residing in municipalities to grant, extend, or renew franchises for periods not to exceed 25 years. Art. 18, Secs. 5(a) and 5(b), Okla.Constitution. We so held in Caddo Electric Cooperative v. State ex rel. Whelan (1964), Okl., 391 P.2d 234, 239. The conclusion reached was not supported by any citation of authority. It was dictum. Hawks v. Hamill, 288 U.S. 52, 53

S.Ct. 240, 77 L.Ed. 610; 2 Okl.Law Review at page 185.

In Hamill v. Hawks (1932) 10th Circuit, 58 F.2d 41, promulgated two years subsequent to our decision in the Okmulgee case, that court considered the meaning and import of Art. 2, Sec. 32, Oklahoma Constitution and stated:

"We do not doubt that the word 'perpetuities' in said section (of Okla.Const.) was not intended to mean or be equivalent to perpetual franchises, but was intended to limit the power to pass titles that would vest in future. It was so applied by the Supreme Court of Oklahoma in McLaughlin v. Yingling, 90 Okl. 159, 213 P. 552, and In re Street's Estate, 138 Okl. 115, 280 P. 413."

On appeal of *Hamill* to the Supreme Court of the United States, 288 U.S. 52, 53 S.Ct. 240, at 242, 77 L.Ed. 610, at 616, it was said:

"We do not now determine what meaning we would give to the Oklahoma Constitution if the question were before us as an original one, unhampered by any pronouncement of the courts of that state. *Much can be said in support of the respondents' position that the perpetuities denounced are those arising from the creation of future estates or from restraints upon alienation without reasonable limit.*" (Emphasis supplied, and see in this connection Phillips v. Chambers (1935), 174 Okl. 407, 51 P.2d 303; Le-Force v. Bullard (1969), Okl., 454 P.2d 297; City of Chattanooga v. Tennessee Electric Power Co., 172 Tenn. 524, 112 S.W.2d 385, at page 392; Eager v. Mc-Cow, 143 Tenn. 693, 703, 228 S.W. 709; and 6 Okl.Law Review 1, Perpetuities in Oklahoma, which support the emphasized view.)

We conclude that 18 O.S.1961, Sec. 437.-2(k), and 69 O.S.1961, Sections 4 and 57, which authorize Caddo Electric and Public Service Company to use the highways of this state, as conditionally limited in time by Art. 9, Sec. 47, Oklahoma Constitution, constitute terminable permits, and that the 500-foot law is not unconstitutional as in violation of the prohibition against perpetuities in Art. 2, Sec. 32, Oklahoma Constitution. The Okmulgee case, insofar as it would hold to the contrary, is overruled.

Public Service Company contends that the 500-foot law grants exclusive franchises in violation of Article 5, Section 51, Oklahoma Constitution, and violates the 14th Amendment of the Constitution of the United States by denying public utility companies the equal protection of the law. Since the solution to these questions depends upon whether the 500-foot law constitutes a proper exercise of the police power they will be considered together.

This court has approved monopolies in holding that the chartering of a limited number of banks; the requirement that truck companies obtain certificates of public convenience and necessity as a prerequisite to use the highways; and the licensing of dental laboratories are justified under the police power and do not offend the provisions of Art. 5, Sec. 51, and Art. 2, Sec. 32, Oklahoma Constitution. Noble State Bank v. Haskell (1909), 22 Okl. 48, 97 P. 590; Ex parte Tindall (1924), 102 Okl. 192, 229 P. 125. Thrasher v. Board of Governors (1961), Okl., 359 P.2d 717.

In the 6th paragraph of the court's syllabus in *Tindall* we held:

"The police power is an attribute of sovereignty, inherent in every sovereign state, and not derived from any written Constitution nor vested by grant of any superior power.

"The term 'police power' comprehends the power to make and enforce all wholesome and reasonable laws and regulations necessary to the maintenance, upbuilding, and advancement of the public weal and protection of the public interests.

"It is plastic in its nature, and will expand to meet the actual requirements of an advancing civilization and adjust itself to the necessities of moral, sanitary, economic, and political conditions.

"No principle in our system of government will limit the right of government

to respond to public needs and protect the public welfare."

In the 9th paragraph of the syllabus we held that the limitations in Art. 2, Sec. 32, and Art. 5, Sec. 51, Oklahoma Constitution, against the granting of exclusive rights and privileges and the creation of monopolies are not exceeded by an act which confers upon the Corporation Commission the power to make and enforce certain rules, where the power to enforce such rules is made conditioned upon the fact of public convenience and necessity.

In 29 C.J.S. Electricity § 13b it is said:

"It is the policy of the law to avoid the wasteful duplication of electric service and this policy is normally effectuated by granting or refusing certificates of convenience and necessity for the construction of facilities for the conduct of the electric energy business in a given area."

In East Central Oklahoma Electric Cooperative v. Public Service Company (1970), Okl., 469 P.2d 662, we said that the obvious purpose of the 500-foot law is to prevent the wasteful duplication of distribution lines by competing suppliers of electric service, "a waste for which the customers of these public utilities would eventually have to pay." It is also becoming increasingly important to prevent the waste of materials, such as copper and aluminum and poles to sustain their distribution lines.

In 36 Am.Jur., Monopolies, Combinations, Etc., § 40, it is said that the constitutions of most of the states provide, in one form or another, against the granting of exclusive rights or privileges to individuals or private corporations. However, in the next section (Sec. 41) it is said unless the Constitution prohibits all monopolies by name, it seems established that even in states whose Constitutions contain general provisions against monopolies, exclusive privileges and franchises may be granted in the public interest, or when necessary to the public safety or welfare. Therein it is further said:

"In general, if the necessity and reasonable adaptation of the monopoly to the accomplishment of a legitimate purpose furnish the true criterion, it would seem that before applying these general constitutional provisions to a statute creating a monopoly, it is necessary to determine, independently of them, whether or not the monopoly is necessary and reasonably adapted to the accomplishment of a legitimate police or public purpose.

It is generally held that in regulating public services state legislatures have the power to grant exclusive franchises. 58 C.J.S. Monopolies § 11.

On the question of whether public service companies are denied the equal protection of the law by the 500-foot law it has been said that any attempted exercise of the police power which results in a denial of the equal protection of the laws is invalid; and that in order to justify an exercise of the police power it must appear that the interests of the public generally, as distinguished from those of a particular class, require such interference. This is because a police regulation cannot be invoked to protect one class of citizens against another class unless such interference is for the protection of society in general. 16 Am.Jur.2d, Constitutional Law, § 297. In Noble State Bank v. Haskell (1911), 219 U.S. 104, 31 S.Ct. 186, 55 L.Ed. 112 (appealed from this Court, 97 P. 590) it was said:

"We must be cautious about pressing the broad words of the 14th Amendment to a drily logical extreme. Many laws which it would be vain to ask the court to overthrow could be shown, easily enough, to transgress a scholastic interpretation of one or another of the great guaranties in the Bill of Rights. They more or less limit the liberty of the individual, or they diminish property to a certain extent. We have few scientifically certain criteria of legislation, and as it often is difficult to mark the line where what is called the police power of the states is limited by the Constitution of the United States, judges should be slow to read into the latter a nolumus mutare as against the lawmaking power."

In argument Public Service Company states that "presumably, the object (of the 500-foot law) is to assure adequate electric service to such (rural) areas." We agree that it serves that purpose. However, it is argued that the 500-foot law places in one category the company which is already serving the (500-foot) area and places all other companies, not in the area, in a different category and denies them access to the area. It concludes that "the classification is arbitrary, bears no relation to the matter of providing adequate service, and is unreasonable on its face." We are unable to agree.

It is admitted that privately financed public utilities have not extensively extended their lines into rural areas. Private capital is not slow to find its way into profitable investments. It may be assumed that indiscriminate electrification in rural areas is not profitable, else privately financed distribution lines could have been constructed in rural areas in greater quantity at any time between 1913 (when they were statutorily authorized to use the highways for their poles and wires) and the adoption of the 500-foot law in 1961. Unrestrained competition in rural areas could so impair the financial returns from distribution lines of all companies as to make it difficult, if not impossible, to provide electric service in rural areas where population is diminishing. The 500-foot law will assist any company which has pre-empted an area to remain and provide adequate electric service to its members or customers at acceptable rates.

In connection with this argument it is said that the 500-foot law gives the cooperatives a virtual monopoly in rural areas because of their predominance, whereas public utilities are not protected from competition in municipalities. Art. 18, Secs. 5(a), 5(b), and 7, Okla.Constitution, provide that no exclusive franchises shall ever be granted (by a municipality).

Rural electric cooperatives are chartered to supply electric energy in rural areas. 18 O.S.1961, Secs. 437.1 and 437.2(d). A city or town having a population in excess of 1500 is not a rural area. 18 O.S.1961, Sec. 437.28. The only occasion when a rural electric cooperative may render electric service in a municipality having a population in excess of 1500 is when a municipality annexes territory that is served by an electric cooperative. Sec. 437.28, supra. Caddo Electric Cooperative v. State ex rel. Whelan (1964), Okl., 391 P.2d 234. Sec. 437.28 serves to prevent waste and protects constitutionally vested rights. City of Beverly Hills v. City of Los Angeles (1917), 175 Cal. 311, 165 P. 924; Muskogee National Telephone Co. v. Hall (1901), 4 Ind.T. 18, 64 S.W. 600; Baker v. Tulsa Bldg. & Loan Ass'n, 179 Okl. 432, 66 P.2d 45. Competition by cooperatives in municipalities having less than 1500 population is reduced for the reason that the national Rural Electrification Act of 1936, 7 U.S. C.A. § 902, authorizes loans for supplying electric energy to persons in rural areas "who are not receiving central station service." It would seem that public utilities which have established their lines in municipalities are adequately protected by state and federal law from competition of rural electric cooperatives.

Our attention is invited to several cases to support the proposition that the 500-foot law denies public utility companies the equal protection of the law.

In Frost v. Corporation Commission (1929), 278 U.S. 515, 49 S.Ct. 235, 73 L.Ed. 483, Frost owned and operated a cotton gin in Durant, Oklahoma, for profit. He operated the gin under a permit he had obtained from the Corporation Commission after making a showing of public necessity as required by law. In 1919 our Legislature enacted a statute permitting the organization of capital stock cooperatives, *operated for profit,* to engage in the cotton ginning business, and in effect required the Corporation Commission to grant such cooperatives permits without a showing of public necessity upon the petition of 100 citizens and tax-payers. See statute now codified as 17 O.S.1961, Sec. 43. In

*Frost,* the United States Supreme Court simply held that since both privately owned cotton gins and cotton gins operated cooperatively under the 1919 act were operating for profit, the differences relied upon for different treatment were without substance and resulted in an unequal protection of the law. In the case now before us, Caddo Electric Cooperative, organized under the Rural Electric Cooperative Act, 18 O.S. 1961, Sections 437 et seq., is a membership cooperative having no capital stock, and is not operated for profit. The reasoning in *Frost* is therefore not pertinent here.

In Community Pub. Service Co. v. New Mexico Pub. Service Comm. (1966), 76 N. M. 314, 414 P.2d 675, New Mexico had amended its Rural Electric Cooperative Act and declared rural electric cooperatives to be public utilities. However, that court pointed out that the statute, as amended, limited a cooperative's service to its members and to others but not in excess of 10% of the number of its members, and that there was no provision for the regulation of rates charged by cooperatives. At page 678 of the opinion the court observed that the cooperative seeks to make a profit out of customers who are not members and applied the reasoning and result reached in Frost v. Corporation Commission, supra.

In Oklahoma our Legislature has effectively made provision for the regulation of rates to be charged by cooperatives. 18 O.S.1961, Sec. 437.19 sets forth the purposes for which cooperative revenues may be used and further provides that excess revenues will be refunded to its members unless otherwise determined by its members.

In the instant case there is no evidence that Caddo Electric Cooperative seeks to make a profit out of non-members nor that non-members are deprived of the refunds given to members. There is no evidence here that the limit of non-members to 10% of its members is inadequate to accommodate all applicants for service who do not desire to become members.

In McCrady v. Western Farmers Electric Cooperative (1958), Okl., 323 P.2d 356, we noticed the legislative history of the rural electrification program and concluded that the objectives prompting the program could not be ignored in construing the statutes. We there held that a cooperative organized under the Rural Electric Cooperative Act may not arbitrarily or unreasonably exclude from membership any member of the public within the territory served by its distribution system. See also Application of Trico Electric Coop., Inc. (1962), 92 Ariz. 373, 377 P.2d 309 and Anno. 56 A.L.R.2d 413. We think the reasoning in McCrady is applicable here, so that Caddo Electric may not arbitrarily or unreasonably charge non-members a higher rate for its service than it charges its members. It was never intended under State and Federal law that persons residing in rural areas would be deprived of the equal protection of the law whether they elect to accept service as a member or non-member of a cooperative.

In Dickinson v. Maine Public Service Co. (1966), Me., 223 A.2d 435, individuals who were residing in franchised areas of public utility companies and receiving electric service from a rural electric cooperative petitioned the Public Utilities Commission to require the public utility companies to provide them with electrical service.

In Maine a rural electric cooperative could serve only its members; it was not a public utility; it had no territorial monopoly; and did not have the power of eminent domain. However, public utilities could be forced to serve in rural areas where economically feasible.

Under a new law enacted in 1965, Maine cooperatives were given territorial monopolies, but still could not serve non-members. They were (by 1965 amendment) deemed public utilities, but their rates and indebtedness was not controlled by the Public Utilities Commission. Any person denied membership, or member receiving inadequate service, could complain to the Commission. Cooperatives were given the power of eminent domain.

The Maine Court held that notwithstanding the amendment electric cooperatives

were not public utilities because they could serve only their members. They were not entitled to enjoy monopolies since they were not sufficiently regulated or controlled and could not be compelled to serve the general public. The Maine Court relied in part upon Community Public Service Co. v. New Mexico Pub. Service Comm., 76 N.M. 314, 414 P.2d 675, supra, which had relied upon Frost v. Corporation Commission, supra.

In Oklahoma a public service company may not be compelled to serve any community or area it has not undertaken or professed to serve. Okla. Natural Gas Co. v. Corporation Commission, 88 Okl. 51, 211 P. 401; Phillips Petroleum Company v. Corporation Commission, Okl., 312 P.2d 916.

There can be no doubt that rural electric cooperatives in Oklahoma are public service corporations. The fact that they are not controlled by the Corporation Commission as public utilities does not change their character as public service corporations. In Art. 9, Sec. 34, Okla. Const., "public service corporation" is defined to include all electric, heat, light and power companies, and all corporations having the right of eminent domain or the right to use the highways in a manner not permitted to the general public. Rural electric cooperatives have the right of eminent domain, 18 O.S.1961, Sec. 437.2(o), and the right to use the highways, 18 O.S. 1961, Sec. 437.2(k). Art. 9, Sec. 19, Oklahoma Constitution, provides that the Commission may be vested with such other duties as may be prescribed by law. "Public Utility" as defined in 17 O.S.1961, Sec. 151, is broad enough to include rural electric cooperatives, and in 17 O.S.1961, Sec. 152, (adopted 1913) the Commission is given general supervision over all public utilities. However, in 1939 the Legislature excluded rural electric cooperatives from the jurisdiction of the Corporation Commission, 18 O.S.1951, Sec. 437.26, which it had the authority to do under Art. 9, Sec. 19, Oklahoma Constitution, supra.

We conclude that the 500-foot law constitutes a justified use of the State's police power and does not violate the provisions of Article 5, Section 51, and Article 2, Section 32, Oklahoma Constitution.

The remaining question squarely presented is whether the statute exempting cooperatives from the jurisdiction and control of the Corporation Commission results in depriving Public Service Company, which is controlled by the Commission, 17 O.S. 1961, Sec. 152, the equal protection of the law. We hold that it does not.

Public Service Company operates for profit. It is in the interest of the public that its rates, services, operation, and management be controlled. It is in the interest of the public that its financial investments in distribution lines be protected. It was given the protection afforded by the 500-foot law in East Central Okl. Elec. Co-op., Inc. v. Public Service Company (1970), 463 P. 2d 980.

Rural Electric Cooperatives are non-profit membership cooperatives. The management and operation of these cooperatives are controlled by their members. 18 O.S.1961, Sec. 437.6. Since members pay the cost of the operation it is to their interest to keep costs at a minimum. Rates are necessarily controlled by the cost of the installation and the operation. Revenues received by a cooperative in any fiscal year in excess of statutorily authorized expenditures and obligations are returned to its members, prorated in accordance with patronage of its members, unless otherwise directed by its members. 18 O.S. 1961, Sec. 437.19.

Considering the reasons and law herein set forth, and the distinctions between the law and facts set forth in the cases relied upon by Public Service Company, we conclude that the 500-foot law does not deprive Public Service Company of the equal protection of the law.

We do not hold that Electric Cooperatives are not amenable to the police power of this State, nor that they may not be

placed under the control of the Corporation Commission if the Legislature should so determine. Under existing law the equity powers of the district court are adequate to provide the Town of Fort Cobb the equal protection of the law whether it elects to accept service as a member or non-member of Caddo Electric Cooperative.

The judgment of the trial court is affirmed.

IRWIN, C. J., BERRY, V. C. J., and WILLIAMS, BLACKBIRD, HODGES, LAVENDER and McINERNEY, JJ., concur.